Sergeant Perry J. WATKINS,
Plaintiff–Appellant,

v.

UNITED STATES ARMY, et al.,
Defendants–Appellees.

No. 85–4006.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 22, 1987.

Decided Feb. 10, 1988.

As Amended June 8, 1988.

Rehearing en banc ordered
June 8, 1988.*

* See 847 F.2d 1362 (9th Cir.1988).

James E. Lobsenz, Wolfe & Cullen, Seattle, Wash., for plaintiff-appellant.

E. Roy Hawkens, Asst. U.S. Atty., Civil Div., Washington, D.C., for defendants-appellees.

Before CANBY, NORRIS and REINHARDT, Circuit Judges.

NORRIS, Circuit Judge:

In August 1967, at the age of 19, Perry Watkins enlisted in the United States Army. In filling out the Army's pre-induction medical form, he candidly marked "yes" in response to a question whether he had homosexual tendencies. The Army nonetheless considered Watkins "qualified for admission" and inducted him into its ranks. Watkins served fourteen years in the Army, and became, in the words of his commanding officer, "one of our most respected and trusted soldiers." Excerpt of Record [ER] at 26d.

Even though Watkins' homosexuality was always common knowledge, *Watkins v. United States Army*, 551 F.Supp. 212, 216 (W.D.Wash.1982), the Army has never claimed that his sexual orientation or behavior interfered in any way with military functions.[1] To the contrary, an Army review board found "there is no evidence suggesting that his behavior has had either a degrading effect upon unit performance, morale or discipline, or upon his own job performance." ER at 26c.

In 1981 the Army promulgated new regulations which mandated the disqualifica-

---

1. In this opinion we use the term "sexual orientation" to refer to the orientation of an individual's sexual preference, not to his actual sexual conduct. Individuals whose sexual orientation creates in them a desire for sexual relationships with persons of the opposite sex have a heterosexual orientation. Individuals whose sexual orientation creates in them a desire for sexual relationships with persons of the same sex have a homosexual orientation.

In contrast, we use the terms "homosexual conduct" and "homosexual acts" to refer to sexual activity between two members of the same sex whether their orientations are homosexual, heterosexual, or bisexual, and we use the terms "heterosexual conduct" and "heterosexual acts" to refer to sexual activity between two members of the opposite sex whether their orientations are homosexual, heterosexual, or bisexual.

Throughout this opinion, the terms "gay" and "homosexual" will be used synonymously to denote persons of homosexual orientation.

tion of all homosexuals from the Army without regard to the length or quality of their military service. Pursuant to these new regulations, the Army notified Watkins that he would be discharged and denied reenlistment because of his homosexuality. In this federal court action, Watkins challenges the Army's actions and new regulations on various statutory and constitutional grounds.

I

During Watkins' initial three-year tour of duty, he served in the United States and Korea as a chaplain's assistant, personnel specialist, and company clerk. Even before this tour began, Watkins indicated on his pre-induction medical history form that he had "homosexual tendencies." A year later, in 1968, Watkins signed an affidavit stating that he had been gay from the age of 13 and that, since his enlistment, had engaged in sodomy with two other servicemen, a crime under military law. The Army, which received this affidavit as part of a criminal investigation into Watkins' sexual conduct, dropped the investigation for lack of evidence after the two servicemen whom Watkins had named as his sexual partners denied any sexual involvement with him. Despite repeated investigations of Watkins' sexual behavior after 1968, his 1968 affidavit is the only evidence before this court of Watkins' actual sexual conduct. *See infra* at 1332 & n. 2.

When his first enlistment expired in 1970, Watkins received an honorable discharge. In 1971 he reenlisted for a second three-year term, at which time the Army judged him to be "eligible for reentry on active duty." In 1972 the Army again investigated Watkins for allegedly committing sodomy and again terminated the investigation for insufficient evidence. In 1974 the Army accepted Watkins' application for a six-year reenlistment.

In 1975 the Army convened a board of officers to determine whether Watkins should be discharged because of his homosexual tendencies. On this occasion his commanding officer, Captain Bast, testified that Watkins was "the best clerk I have known," that he did "a fantastic job—excellent," and that Watkins' homosexuality did not affect the company. A sergeant testified that Watkins' homosexuality was well-known but caused no problems and generated no complaints from other soldiers. The four officers on the board unanimously found that "Watkins is suitable for retention in the military service" and stated, "In view of the findings, the Board recommends that SP5 Perry J. Watkins be retained in the military service because there is no evidence suggesting that his behavior has had either a degrading effect upon unit performance, morale or discipline, or upon his own job performance. SP5 Watkins is suited for duty in administrative positions and progression through Specialist rating." ER at 26c.

In November 1977, the United States Army Artillery Group (the USAAG) granted Watkins a security clearance for information classified as "Secret." His application for a position in the Nuclear Surety Personnel Reliability Program (the PRP), however, was initially rejected because his records—specifically, his own admissions—showed that he had homosexual tendencies. After this initial rejection, Watkins' commanding officer in the USAAG, Captain Pastain, requested that Watkins be requalified for the position. Captain Pastain stated, "From daily personal contacts I can attest to the outstanding professional attitude, integrity, and suitability for assignment within the PRP, of SP5 Watkins. In the 6½ months he has been assigned to this unit SP5 Watkins has had no problems what-so-ever in dealing with other assigned members. He has, in fact, become one of our most respected and trusted soldiers, both by his superiors and his subordinates." ER at 26d. An examining Army physician concluded that Watkins' homosexuality appeared to cause no problem in his work, and the decision to deny Watkins a position in the Nuclear Surety Personnel Reliability Program was reversed.

Watkins worked under a security clearance without incident until he again stated, in an interview on March 15, 1979, that he was homosexual. This prompted yet an-

other Army investigation which, in July 1980, culminated in the revocation of Watkins' security clearance. As Watkins' notification of revocation makes clear, the Army based this revocation on Watkins' 1979 admission of homosexuality, on medical records containing Watkins' 1968 affidavit stating that he had engaged in homosexual conduct, and on his history of performing (with the permission of his commanding officer) as a female impersonator in various revues. The Army did not rely on any evidence of homosexual conduct other than Watkins' 1968 affidavit. *See supra* at 1331.

In October 1979, the Army accepted Watkins' application for another three-year reenlistment.

In 1981 the Army promulgated Army Regulation, (AR) 635–200, chpt. 15, which mandated the discharge of all homosexuals regardless of merit. Pursuant to this regulation, a new Army board convened to consider discharging Watkins. Although this board explicitly rejected the evidence before it that Watkins had engaged in homosexual conduct after 1968,[2] the board recommended that Watkins be separated from the service "because he has stated that he is a homosexual."

**2.** During these discharge proceedings the Army tried to prove that Watkins had engaged in homosexual conduct by introducing the testimony of one soldier that a black staff sergeant had "squeezed his leg" and the testimony of another soldier that Watkins had "asked him if he'd like to move into [Watkins'] apartment" and that Watkins used to "stare at" him. *Watkins v. United States Army,* 541 F.Supp. 249, 257 (W.D. Wash.1982). The first soldier, however, was unable to identify Watkins in a line-up as the black sergeant who had squeezed his leg (there were thousands of black sergeants at the base). *Id.* The second soldier testified that he was not sure Watkins had been making a pass at him, that he was prejudiced against blacks and against homosexuals, that he had once had a bad experience with a homosexual, and that he had once been disciplined by a board of which Watkins was a member. *Id.* The Army board concluded that this evidence did not support a finding that Watkins had engaged in homosexual acts with these two soldiers, and the district court ruled that any finding to the contrary would have been arbitrary and unsupported by the evidence. *Id.*

Major General Elton, the discharge authority overseeing the board, approved this finding and recommendation and directed that Watkins be discharged. In addition, Major General Elton, on his own *initiative,* made an additional finding that Watkins had engaged in homosexual acts with other soldiers. The district court ruled both that Major General Elton lacked the regulatory authority to make supplemental findings, *Watkins v. United States Army,* 541 F.Supp. 249, 259 (W.D.Wash.1982), and that the evidence presented at the discharge hearing could not support a specific finding that Watkins had engaged in any homosexual conduct after 1968. *Id.* at 257. The Army has not contested either of these rulings and, on appeal, cites only Watkins' 1968 affidavit as evidence of homosexual conduct.

In May 1982, after the Army board voted in favor of Watkins' discharge, but before the discharge actually issued, the district court enjoined the Army from discharging Watkins on the basis of his statements admitting his homosexuality. *Id.* at 259 (W.D.Wash.1982).[3] The district court reasoned that the discharge proceedings were barred by the Army's regulation against double jeopardy, AR 635–200, ¶ 1-19b, because they essentially repeated the discharge proceedings of 1975.[4]

**3.** Watkins had originally brought suit in August 1981 to have his security clearance reinstated, but after receiving notice that discharge proceedings would be convened, he amended his complaint in October to seek an injunction against his discharge. The district court declined to reach the issue whether the Army could revoke Watkins' security clearance, reasoning that the issue was not yet ripe because Watkins had an administrative appeal pending. *See* 541 F.Supp. at 259; *see also* 551 F.Supp. at 223. Watkins' security clearance dispute is thus not before us on this appeal.

**4.** The district court held that the evidence could not support a finding that Watkins engaged in homosexual conduct subsequent to the 1975 discharge proceedings and that the Army's double jeopardy provision barred the Army from basing Watkins' discharge on statements that merely reiterated what Watkins had stated in the 1975 discharge proceedings—that he was homosexual. *See* 541 F.Supp. at 257-58.

During oral argument before the district court, counsel for the Army declared that if the Army were enjoined from discharging Watkins, it would deny Watkins reenlistment, pursuant to AR 601–280, ¶ 2–21(c), when his current tour of duty expired in October 1982.[5] This reenlistment regulation, which was promulgated in 1981 along with the discharge regulation AR 635–200, chpt. 15, makes homosexuality a nonwaivable disqualification for reenlistment. The district court nonetheless enjoined Watkins' discharge, and the Army fulfilled its promise by rejecting Watkins' reenlistment application "[b]ecause of self admitted homosexuality as well as homosexual acts."[6]

On October 5, 1982, the district court enjoined the Army from refusing to reenlist Watkins because of his admitted homosexuality, holding that the Army was equitably estopped from relying on AR 601–280, ¶ 2–21(c). *Watkins v. United States Army*, 551 F.Supp. 212, 223 (W.D.Wash. 1982).[7] The Army reenlisted Watkins for a six-year term on November 1, 1982, with the proviso that the reenlistment would be voided if the district court's injunction were not upheld on appeal.

While the Army's appeal of the district court injunction was pending, the Army rated Watkins' performance and professionalism. He received 85 out of 85 possible points. *See* Appendix to Appellant's Brief; Court Record 164, Appendix C. His ratings included perfect scores for "Earns respect," "Integrity," "Loyalty," "Moral Courage," "Self-discipline," "Military Appearance," "Demonstrates Initiative," "Performs under pressure," "Attains results," "Displays sound judgment," "Communicates effectively," "Develops subordinates," "Demonstrates technical skills," and "Physical fitness." *Id.* His military evaluators unanimously recommended that he be promoted ahead of his peers. *Id.* The Army's written evaluation of Watkins' performance and potential stated:

SSG Watkins is without exception, one of the finest Personnel Action Center Supervisors I have encountered. Through his diligent efforts, the Battalion Personnel Action Center achieved a near perfect processing rate for SIPDERS transactions. During this training period, SSG Watkins has been totally reliable and a wealth of knowledge. He requires no supervision, and with his "can do" attitude, always exceeds the requirements and demands placed upon him. I would gladly welcome another opportunity to serve with him, and firmly believe that he will be an asset to any unit to which he is assigned.

SSG Watkins should be selected to attend ANCOC and placed in a Platoon Sergeant position. [Rater's Evaluation of Watkins' performance and potential.]

SSG Watkins' duty performance has been outstanding in every regard. His

---

5. At that time, the regulation appeared at ¶ 2–24(c). However, for convenience, our opinion will refer to all Army regulations by the paragraph numbers used in the Army's September 15, 1986, update, unless a different date is explicitly noted.

6. Again, we emphasize that Watkins' 1968 affidavit stating that he had engaged in homosexual acts is the only evidence before this court that provides support for Captain Scott's finding of homosexual conduct. *See supra* at 1332 & n. 2. That the Army had no new evidence of homosexual conduct is evident from the Army's interrogation of Watkins at the time that he applied for reenlistment. 551 F.Supp. at 225–32. During extraordinarily aggressive questioning aimed at eliciting a new confession of homosexual conduct from Watkins, the Army's interrogating officer admitted that he had no new basis for suspecting that Watkins had engaged in additional homosexual acts. *Id.* at 227.

Captain Scott, who made the above findings, also found that Watkins had refused to answer questions concerning his homosexuality and homosexual acts, but the district court ruled that this finding was totally unsupported by the evidence. *See* 551 F.Supp. at 217. The Army has not contested this ruling of the district court and does not argue on appeal that Watkins refused to answer questions.

7. This case does not involve an asserted right to reenlist or a claim that courts can exercise general review of the Army's reenlistment decisions. Watkins does not seek a judicial determination on the merits of his reenlistment application. He merely seeks a judicial determination that the Army must consider his reenlistment application on its merits without regard to his homosexuality. *See* 551 F.Supp. at 218.

section continues to set the standard within the Brigade for submission of accurate, timely personnel and financial transactions. Keeping abreast of ever-changing personnel regulations and directives, SSG Watkins has provided sound advice to the commander as well as to the soldiers within the command. His suggestion to separate S–1 and Personnel Action Center functions and to colocate the Personnel Action Center with the Company Orderly Rooms was adopted and immediately resulted in improved service by both offices. SSG Watkins' positive influence has been felt throughout the Battalion and will be sorely missed.

SSG Watkins' potential is unlimited. He has consistently demonstrated the capacity to manage numerous complex responsibilities concurrently. He is qualified for promotion now and should be selected for attendance at ANCOES at the earliest opportunity. [Indorser's Evaluation of Watkins' performance and potential.]

*Id.*

On appeal, we reversed the district court's injunction. We reasoned that the equity powers of the federal courts could not be exercised to order military officials to violate their own regulations absent a determination that the regulations were repugnant to the Constitution or to the military's statutory authority. *Watkins v. United States Army*, 721 F.2d 687, 690–91 (9th Cir.1983) [hereinafter *Watkins I*]. On remand, the district court held that the Army's regulations were not repugnant to the Constitution or to statutory authority and accordingly denied Watkins' motion for summary judgment and granted summary judgment in favor of the Army. Watkins appealed, invoking our jurisdiction under 28 U.S.C. § 1291.

Watkins argues on this appeal that the Army's actions in discharging him and denying him reenlistment violate the First Amendment and constitute due process entrapment in violation of the Fifth Amendment. He also argues that the Army's discharge and reenlistment regulations are arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. 706(2)(A), and deny him equal protection of the laws in violation of the Fifth Amendment. Notably, Watkins recognizes that the Supreme Court's decision in *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed. 2d 140 (1986), forecloses this court from deciding that the Army's regulation violate substantive due process. *See infra* at 1339–43.

## II

Almost all of Watkins' arguments can be rejected without reaching their merits. Watkins' argument that denying him reenlistment was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982), fails because Watkins does not claim that the regulations on homosexuality themselves violate the Administrative Procedure Act. *See Watkins I*, 721 F.2d at 690–91. Similar reasons lead us to reject two additional claims raised by Watkins: his "petition clause" argument that the Army refused to reenlist Watkins in retaliation for his suit over revocation of his security clearance and his "due process entrapment" claim that the Army had induced him to believe that his homosexuality would not disqualify him from a career in the Army. Whether or not the Army's actions, in the absence of the regulations, would have constituted unconstitutional retaliation or due process entrapment, to enjoin the Army from denying Watkins' reenlistment on the basis of his homosexuality would be in direct contravention of its regulations. This we cannot do unless the regulations themselves are unconstitutional. *Id.* Since Watkins does not allege that the regulations, either on their face or as applied, violate the petition clause or constitute due process entrapment, we have no authority to issue the requested relief on those grounds.

Watkins' argument that the Army regulations violate the First Amendment by penalizing his statements regarding his homosexuality is somewhat more troublesome. *See benShalom v. Secretary of the Army*, 489 F.Supp. 964, 973–75 (E.D.Wis.

1980) (holding that the Army violated the First Amendment by discharging soldier solely because she stated she was a homosexual when there was no evidence of homosexual conduct). In contrast to *benShalom,* however, the determination of Watkins' homosexuality—which absolutely disqualified him from service under the regulations—was based both on his various statements admitting his homosexual orientation and on his 1968 statement that he had engaged in homosexual acts. The regulations clearly mandate that homosexual acts give rise to a disqualifying presumption of homosexuality, though that presumption can be rebutted by proof of actual nonhomosexual orientation. *See infra* at 1336–39. In other words, under the regulations, any *homosexual* who engages in homosexual acts is automatically disqualified from service. Since Watkins admitted in 1968 that he had engaged in homosexual acts, he was presumed under the regulations to have a homosexual orientation, and could not rebut that presumption because his orientation was, in fact, homosexual. Thus, the regulations mandated both Watkins' discharge and the denial of his reenlistment regardless of whether he had ever stated that he had homosexual tendencies. Consequently,

Watkins could obtain no relief from a judicial determination that his statements declaring his homosexual orientation were protected by the First Amendment unless he could also show that the portions of the Army's regulations that ban homosexuals who engage in homosexual *acts* are invalid.[8] *See Matthews v. Marsh,* 755 F.2d 182, 184 (1st Cir.1985) (in light of evidence that plaintiff engaged in homosexual acts, a ruling as to whether her discharge from the Army for statements about her homosexuality violated the First Amendment would be an advisory opinion).

We are left, then, with Watkins' claim that the Army's regulations deny him equal protection of the laws in violation of the Fifth Amendment.[9]  Specifically, Watkins argues that the Army's regulations constitute an invidious discrimination based on sexual orientation. To address this claim we must engage in a three-stage inquiry. First, we must decide whether the regulations in fact discriminate on the basis  of sexual orientation. Second, we must decide which level of judicial scrutiny applies by asking whether discrimination based on sexual orientation burdens a suspect or quasi-suspect class,[10] which would make it subject, respectively, to strict or

---

8. *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), is not to the contrary. In *Mt. Healthy,* the Supreme Court held that governmental action can violate the First Amendment when it is taken for mixed motives, one of which is to penalize an individual for exercising his right to freedom of speech. *See id.* at 284–87, 97 S.Ct. at 574–76. The Supreme Court adopted a "but for" causation test: Once a plaintiff demonstrates that his conduct is constitutionally protected and a "substantial factor" in the government's adverse decision, the burden of proof shifts to the government to show that it would have reached the same decision in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. at 576. *Mt. Healthy,* however, concerned a *discretionary* decision not to grant tenure to a teacher who had engaged in constitutionally protected speech. This case, in contrast, involves a nondiscretionary regulation that *absolutely* disqualified Watkins from Army service because he was a homosexual who admitted to engaging in homosexual acts. *See* AR 635–200, ¶ 15–3; AR 601–280, ¶ 2–21(c). The government's burden under *Mt. Healthy* to show that it would have reached the same decision in the absence of the protected

speech is therefore met by the dictates of the regulations themselves.

9. The equal protection component of the Fifth Amendment imposes precisely the same constitutional requirements on the federal government as the equal protection clause of the Fourteenth Amendment imposes on state governments. *See, e.g., Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975).

10. Discriminations that burden some despised or politically powerless groups are so likely to reflect antipathy against those groups that the classifications are inherently suspect and must be strictly scrutinized. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 2394 n. 14, 72 L.Ed.2d 786 (1982). Such groups are generally termed "suspect classes." The Supreme Court has identified other groups whose history of past discrimination entitles them to intermediate scrutiny protection under equal protection doctrine. Such groups are termed "quasi suspect" classes. *See generally,* Nowak, Rotunda & Young, *Constitutional Law,* Ch. 16, § 1, at 593 (2d ed. 1983).

intermediate scrutiny. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439–41, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985). If the discrimination burdens no such class, it is subject to ordinary rationality review. *Id.* Finally, we must decide whether the challenged regulations survive the applicable level of scrutiny by deciding whether, under strict scrutiny, the legal classification is necessary to serve a compelling governmental interest; whether, under intermediate scrutiny, the classification is substantially related to an important governmental interest; or whether, under rationality review, the classification is rationally related to a legitimate governmental interest. *See id.*

### III

We now turn to the threshold question raised by Watkins' equal protection claim: Do the Army's regulations discriminate based on sexual orientation? The portion of the Army's reenlistment regulation that bars homosexuals from reenlisting states in full:

> Applicants to whom the disqualifications below apply are ineligible for RA [Regular Army] reenlistment at any time and requests for waiver or exception to policy will not be submitted....
>
> c. Persons of questionable moral character and a history of antisocial behavior, sexual perversion or homosexuality. A person who has committed homosexual acts or is an admitted homosexual

but as to whom there is no evidence that they have engaged in homosexual acts either before or during military service is included. (See note 1)....

> k. Persons being discharged under AR 635–200 for homosexuality....
>
> *Note:* Homosexual acts consist of bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent of obtaining or giving sexual satisfaction, or any proposal, solicitation, or attempt to perform such an act. Persons who have been involved in homosexual acts in an apparently isolated episode, stemming solely from immaturity, curiosity [sic], or intoxication, and in the absence of other evidence that the person is a homosexual, normally will not be excluded from reenlistment. A homosexual is a person, regardless of sex, who desires bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent to obtain or give sexual gratification. Any official, private, or public profession of homosexuality, may be considered in determining whether a person is an admitted homosexual.

AR 601–280, ¶ 2–21. Although worded in somewhat greater detail, the Army's regulation mandating the separation of homosexual soldiers from service (discharge), AR 635–200, is essentially the same in substance.[11]

---

11. AR 635–200 provides:
    **15–2 Definitions** ...
    a. Homosexual means a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts.
    b. Bisexual means a person who engages in, desires to engage in, or intends to engage in homosexual and heterosexual acts.
    c. A homosexual act means bodily contact, actively undertaken or passively permitted, between soldiers of the same sex for sexual satisfaction.
    **15–3 Criteria**
    The basis for separation may include preservice, prior service, or current service conduct or statements. A soldier will be separated per this chapter if one or more of the following approved findings is made:
    a. The soldier has engaged in, attempted to engage in, or solicited another to engage in a

homosexual act unless there are further approved findings that—
    (1) Such conduct is a departure from the soldier's usual and customary behavior; and
    (2) Such conduct is unlikely to recur because it is shown, for example, that the act occurred because of immaturity, intoxication, coercion, or a desire to avoid military service; and
    (3) Such conduct was not accomplished by use of force, coercion, or intimidation by the soldier during a period of military service; and
    (4) Under the particular circumstances of the case, the soldier's continued presence in the Army is consistent with the interest of the Army in proper discipline, good order, and morale; and
    (5) The soldier does not desire to engage in or intend to engage in homosexual acts.

We conclude that these regulations, on their face, discriminate against homosexuals on the basis of their sexual orientation. Under the regulations any homosexual act or statement of homosexuality gives rise to a presumption of homosexual orientation, and anyone who fails to rebut that presumption is conclusively barred from Army service. In other words, the regulations target homosexual orientation itself. The homosexual acts and statements are merely relevant, and rebuttable, indicators of that orientation.

Under the Army's regulations, "homosexuality," not sexual conduct, is the operative trait for disqualification. AR 601–280, ¶ 2–21(c); *see also* AR 635–200, ¶ 15–1(a) (articulating the same goal). For example, the regulations ban homosexuals who have done nothing more than acknowledge their homosexual orientation even in the absence of evidence that the persons ever engaged in any form of sexual conduct. The reenlistment regulation disqualifies any "admitted homosexual"—a status that can be proved by "[a]ny official, private, or public profession of homosexuality" even if "there is no evidence that they have engaged in homosexual acts either before or during military service." AR 601–280, ¶ 2–21(c) & note; *see also* AR 635–200, ¶ 15–3(b). Since the regulations define a "homosexual" as "a person, regardless of sex, who *desires* bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent to obtain or give sexual gratification," a person can be deemed homosexual under the regulations without ever engaging in a homosexual act. 601–280, ¶ 2–21(c) & note (emphasis added); *see also* A.R. 635–200, 15–2(a) (same desire sufficient to make one homosexual). Thus, no matter what statements a person has made, the ultimate evidentiary issue is whether he or she has a homosexual orientation. Under the reenlistment regulation, persons are disqualified from reenlisting only if, based on any "profession of homosexuality" they have made, they are found to have a homosexual orientation. AR 601–280, ¶ 2–21(c) & note. Similarly, under the discharge regulation a soldier must be discharged if "[t]he soldier has stated that he or she is a homosexual or bisexual, *unless* there is a further finding that the soldier is not a homosexual or bisexual." AR 635–200, ¶ 15–3(b) (emphasis added). In short, the regulations do not penalize all statements of sexual desire, or even only statements of homosexual desire; they penalize only homosexuals who declare their homosexual orientation.

True, a "person who has committed homosexual acts" is also presumptively "included" under the reenlistment regulation

*Note:* To warrant retention of a soldier after finding that he or she engaged in, attempted to engage in, or solicited another to engage in a homosexual act, the board's findings must specifically include all *five* findings listed in a(1) through (5) above. In making these additional findings, boards should reasonably consider the evidence presented. For example, engagement in homosexual acts over a long period of time could hardly be considered "a departure from the soldier's usual and customary behavior." The intent of this policy is to permit retention *only* of *nonhomosexual* soldiers who, because of extenuating circumstances (as demonstrated by findings required by para 15–3a(1) through (5)) engaged in, attempted to engage in, or solicited a homosexual act.

b. The soldier has stated that he or she is a homosexual or bisexual, unless there is a further finding that the soldier is not a homosexual or bisexual.

c. The soldier has married or attempted to marry a person known to be of the same biological sex (as evidenced by the external anatomy of the person involved) unless there are further findings that the soldier is not a homosexual or bisexual (such as, where the purpose of the marriage or attempt to marry was the avoidance or termination of military service). ·

AR 635–200, ¶¶ 15–2 & 15–3 (emphasis in original).

Although it is the Army's refusal to reenlist Watkins because of his homosexuality that is directly at issue, Watkins' challenge to the Army's regulation on discharge is relevant to this appeal for two reasons: (1) persons being validly discharged for homosexuality at the time of reenlistment, as Watkins was, cannot reenlist under 601–280 ¶ 2–21(k); (2) enjoining the Army to consider Watkins' reenlistment application without regard to his homosexuality will provide no effective relief if he would be subject to mandatory discharge because of homosexuality as soon as he was reenlisted. We thus consider Watkins' challenge to the constitutionality of the Army's discharge regulation as well as its reenlistment regulation.

as a person excludable for "homosexuality." AR 601–280, ¶ 2–21(c); *see also* AR 635–200, ¶ 15–3(a). But it is clear that this provision is merely designed to round out the possible evidentiary grounds for inferring a homosexual orientation. The regulations define "homosexual acts" to encompass any "bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent of obtaining or giving sexual satisfaction, or any proposal, solicitation, or attempt to perform such an act." AR 601–280, ¶ 2–21(c) & note; *see also* AR 635–200, ¶¶ 15–2(c) & 15–3(a) (stating the same in slightly different order). Thus, the regulations barring homosexuals from the Army cover any form of bodily contact between persons of the same sex that gives sexual satisfaction—from oral and anal intercourse to holding hands, kissing, caressing and any number of other sexual acts. Indeed, in this case the Army tried to prove at Watkins' discharge proceedings that he had committed a homosexual act described as squeezing the knee of a male soldier, but failed to prove it was Watkins who did the alleged knee-squeezing. *See supra* at 1332 & n. 2. Moreover, even non-sexual conduct can trigger a presumption of homosexuality: The regulations provide for the discharge of soldiers who have "married or attempted to marry a person known to be of the same sex … *unless* there are further findings that the soldier is not a homosexual or bisexual." AR 635–200, ¶ 15–3(c) (emphasis added). With all the acts and statements that can serve as presumptive evidence of homosexuality under the regulations, it is hard to think of any grounds for inferring homosexual orientation that are *not* included.[12] The fact remains, however, that homosexual orientation, not homosexual conduct, is plainly the object of the Army's regulations.

Moreover, under the regulations a person is not automatically disqualified from Army service just because he or she committed a homosexual act. Persons may still qualify for the Army despite their homosexual conduct if they prove to the satisfaction of Army officials that their *orientation* is heterosexual rather than homosexual. To illustrate, the discharge regulation provides that a soldier who engages in homosexual acts can escape discharge if he can show that the conduct was "a departure from the soldier's usual and customary behavior" that "is unlikely to recur because it is shown, for example, that the act occurred because of immaturity, intoxication, coercion, or a desire to avoid military service" *and* that the "soldier does not desire to engage in or intend to engage in homosexual acts." AR 635–200, ¶ 15–3(a). The regulation expressly states, "The intent of this policy is to permit retention *only* of *nonhomosexual* soldiers who, because of extenuating circumstances engaged in, attempted to engage in, or solicited a homosexual act." *Id.* at note (emphasis in original). Similarly, the Army's ban on reenlisting persons who have committed homosexual acts does not apply to "[p]ersons who have been involved in homosexual acts in an apparently isolated episode, stemming solely from immaturity,

---

12. In stark contrast to the breadth and focus of the regulations, the only statute Congress has enacted regulating the private consensual sexual activity of military personnel covers only sodomy, not other forms of sexual conduct, and covers sodomy whether engaged in by homosexuals or heterosexuals. 10 U.S.C. § 925 (1982) provides:

(a) Any person subject to this chapter who engages in unnatural carnal copulation with another person of the same or opposite sex or with an animal is guilty of sodomy. Penetration, however slight, is sufficient to complete the offense.

(b) Any person found guilty of sodomy shall be punished as a court-martial may direct.

Although the statute does not define "sodomy" or "unnatural carnal copulation," the statute does require proof of "penetration," which apparently limits sodomy to oral and anal copulation. *See United States v. Harris,* 8 M.J. 52, 53–59 (C.M.A. 1979). Moreover, the statute explicitly regulates sodomy without regard to sexual orientation by making sodomy illegal whether engaged in by persons of "the same or opposite sex." 10 U.S.C. § 925.

The Army has never made a finding that Watkins ever engaged in an act of sodomy in violation of section 925. Indeed, the Army twice investigated Watkins for allegedly committing sodomy in violation of section 925 and had to drop both investigations because of "insufficient evidence." *See supra* at 1331–32 & n. 2.

curiousity [sic], or intoxication, and in the absence of other evidence that the person is a homosexual." AR 601–280, ¶ 2–21 note. If a straight soldier and a gay soldier of the same sex engage in homosexual acts because they are drunk, immature or curious, the straight soldier may remain in the Army while the gay soldier is automatically terminated. In short, the regulations do not penalize soldiers for engaging in homosexual acts; they penalize soldiers who have engaged in homosexual acts only when the Army decides that those soldiers are actually gay.[13]

In sum, the discrimination against homosexual orientation under these regulations is about as complete as one could imagine.[14] The regulations make any act or statement that might conceivably indicate a homosexual orientation evidence of homosexuality; that evidence is in turn weighed against any evidence of a heterosexual orientation. It is thus clear in answer to our threshold equal protection inquiry that the regulations directly burden the class consisting of persons of homosexual orientation.[15]

### IV

Before reaching the question of the level of scrutiny applicable to discrimination based on sexual orientation and the question whether the Army's regulations survive the applicable level of scrutiny, we first address the Army's argument that we are foreclosed by existing Supreme Court and Ninth Circuit precedent from holding that the Army's regulations deny Watkins equal protection of the laws because they discriminate on the basis of homosexual orientation. The Army first argues that the Supreme Court's decision in *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), forecloses Watkins' equal protection challenge to its regulations. In *Hardwick*, the Court rejected a claim by a homosexual that a Georgia statute criminalizing sodomy deprived him of his liberty without due process of law in violation of the Fourteenth Amendment. More specifically, the Court held that the constitutionally protected right to privacy —recognized in cases such as *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed. 2d 349 (1972)—does not extend to acts of consensual homosexual sodomy.[16] *See id.* 106 S.Ct. at 2843–46. The Court's holding was limited to this due process question. The parties did not argue and the Court explicitly did not decide the question wheth-

**13.** This distinction based on sexual orientation may have directly affected the Army's treatment of Watkins because, were it not for his admitted homosexual orientation, Watkins might have been able to continue his 14-year career by arguing that the homosexual acts to which he admitted in 1968 were the product of his immaturity or curiosity.

**14.** We cannot agree with the premise of Judge Reinhardt's dissent that the Army disqualified Watkins from service because of his homosexual *conduct* as opposed to his homosexual *orientation*. *Dissent* at 1361. First, the regulations encompass all possible evidentiary grounds for inferring homosexual orientation and merely include homosexual acts as one possible, but by no means necessary, ground for drawing that inference. Second, the specific regulations allow some soldiers to remain in the Army despite homosexual conduct if they can prove that they in fact have a non-homosexual orientation.

We also note that homosexual orientation encompasses a range of emotions, desires, and needs wholly separate from sexual conduct and involves an element of individual self-definition

in addition to sexual conduct. We cannot agree with the dissent's view (*Dissent* at 1356–57, 1360–62) that the class comprised of persons who consider themselves homosexual is virtually identical to the class of persons who engage in homosexual conduct, and sodomy in particular.

**15.** Of course, in their attempt to identify soldiers of homosexual orientation, the regulations discriminate in their treatment of homosexual and heterosexual *conduct*. While homosexual acts subject the participants to discharge proceedings by triggering the regulatory presumption of "homosexuality," the identical acts when engaged in by members of the opposite sex do not subject the participants to any such proceedings.

**16.** Under the Court's analysis, because the Constitution's protection of the right to privacy does not extend to homosexual sodomy, a judgment by the state that sodomy is immoral provides a sufficiently rational basis for sodomy laws to satisfy the requirements of substantive due process. *See Hardwick*, 106 S.Ct. at 2846.

er the Georgia sodomy statute might violate the equal protection clause. *See id.* 106 S.Ct. at 2846 & n. 8.[17]

The Army nonetheless argues that it would be "incongruous" to hold that its regulations deprive gays of equal protection of the laws when *Hardwick* holds that there is no constitutionally protected privacy right to engage in homosexual sodomy. Army's Second Supp. Brief at 19. We disagree. First, while *Hardwick* does indeed hold that the due process clause provides no substantive privacy protection for acts of private homosexual sodomy, nothing in *Hardwick* suggests that the state may penalize gays for their sexual orientation. *Cf. Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (holding that state violated due process by criminalizing the status of narcotics addiction, even though the state could criminalize the use of the narcotics—conduct in which narcotics addicts by definition are prone to engage).

■ Second, although *Hardwick* held that the due process clause does not prevent states from criminalizing acts of homosexual sodomy, *id.* 106 S.Ct. at 2842 n. 2, nothing in *Hardwick* actually holds that the state may make invidious distinctions when regulating sexual conduct. Unlike the Army's regulations, the Georgia sodomy statute at issue in *Hardwick* was neutral on its face, making anal and oral intercourse a criminal offense whether engaged in by partners of the same or opposite sex. *See id.* 106 S.Ct. at 2842 n. 1.[18] In deciding a due process challenge to the Georgia statute as applied to homosexual sodomy,[19] the *Hardwick* Court simply did not address either the question whether heterosexual sodomy also falls outside the scope of the right to privacy or the separate question whether homosexual but not heterosexual sodomy may be criminalized without violating the equal protection clause. We cannot read *Hardwick* as standing for the proposition that government may outlaw sodomy only when committed by a disfavored class of persons. Surely, for example, *Hardwick* cannot be read as a license for the government to outlaw sodomy only when committed by blacks. If government insists on regulating private sexual conduct between consenting adults, it must, at a minimum, do so evenhandedly—prohibiting all persons from engaging in the proscribed sexual acts rather than placing the burden of sexual restraint solely on a disfavored minority.[20]

17. *See also Hardwick,* 106 S.Ct. at 2849 (Blackmun J. dissenting) (Court "refused to consider" equal protection clause); *Doe v. Casey,* 796 F.2d 1508, 1522 (D.C.Cir.1986) ("Although ... the Supreme Court's recent decision in *Bowers v. Hardwick* [held] that homosexual *conduct* is not constitutionally protected, the Court did not reach the different issue of whether an agency of the federal government can discriminate against individuals merely because of sexual *orientation*." (footnotes omitted and emphasis in the original)), *cert. granted sub nom. Webster v. Doe,* —— U.S. ——, 107 S.Ct. 3182, 96 L.Ed.2d 671; *Swift v. United States,* 649 F.Supp. 596, 601 (D.D.C.1986) ("this Circuit has declined to read [*Hardwick*] as barring claims of discrimination based on sexual preference"); *but cf. Padula v. Webster,* 822 F.2d 97 (D.C.Cir.1987) ("reasoning in *Hardwick* forecloses ... suspect class status for practicing homosexuals").

18. *Cf. United States v. Lemons,* 697 F.2d 832, 837–38 (8th Cir.1983) (rejecting homosexual's equal protection challenge to sodomy statute because criminal law also prohibited the same conduct between persons of the opposite sex).

19. The district court had dismissed two heterosexual plaintiffs for lack of standing, and they did not appeal. *Hardwick,* 106 S.Ct. at 2842 n. 2.

20. Judge Reinhardt argues in dissent that our opinion reads *Hardwick* as "implicitly permitting the regulation of heterosexual conduct" thereby "increas[ing]—exponentially—the damage to the right to privacy caused by *Hardwick*." *Dissent* at 1355. First, we do not read *Hardwick* as reversing or even undermining any of the cases establishing and defining the right to privacy. We simply read *Hardwick* as refusing to *extend* the constitutionally protected right to privacy to acts of homosexual sodomy. Second, we do not read *Hardwick* as passing judgment one way or the other on whether the constitutionally protected right to privacy extends to heterosexual sodomy. We do note, however, that the Court's reasoning in *Hardwick* rests in major part on its determination that at one time all 50 states outlawed sodomy and that 24 states and the District of Columbia continue to outlaw sodomy. "Against this background," Justice White reasoned, it would be "at best facetious" to claim that "a right to engage in such conduct is 'deeply rooted in our history and tradition' or 'implicit in the concept of ordered liberty.'" 106 S.Ct. at 2845–46. In making this point the

The Army also argues that *Hardwick*'s concern "about the limits of the Court's role in carrying out its constitutional mandate," 106 S.Ct. at 2843, should prevent courts from holding that equal protection doctrine protects homosexuals from discrimination. To be sure, the Court in *Hardwick* justified its refusal to further extend the scope of the right to privacy largely by pointing to the problems allegedly created when judges recognize constitutional "rights not readily identifiable in the Constitution's text" and "having little or no cognizable roots in the language or design of the Constitution." 106 S.Ct. at 2844, 2846. The Court stressed its concern that such rights might be perceived as involving "the imposition of the Justices' own choice of values on the States and the Federal Government" and that this anti-democratic perception might undermine the legitimacy of the Court. *Id.* Finally, the Court expressed the more specific concern about potential difficulties in defining the contours of the right to privacy. *See id.* at 2846.

While it is not our role to question *Hardwick*'s concerns about substantive due process and specifically the right to privacy, these concerns have little relevance to equal protection doctrine.[21] The right to equal protection of the laws has a clear basis in the text of the Constitution. This principle of equal treatment, when imposed against majoritarian rule, arises from the Constitution itself, not from judicial fiat. Moreover, equal protection doctrine does not prevent the majority from enacting laws based on its substantive value choices. Equal protection simply requires that the majority apply its values evenhandedly. Indeed, equal protection doctrine plays an important role in perfecting, rather than frustrating, the democratic process. The constitutional requirement of evenhandedness advances the political legitimacy of majority rule by safeguarding minorities from majoritarian oppression. The requirement of evenhandedness also facilitates a representation of minorities in government that advances the operation of representative democracy.[22] Finally, the practical difficulties of defining the requirements im-

Court drew no distinction between homosexual and heterosexual sodomy, nor do 19 of the 25 jurisdictions that still outlaw sodomy. *See* Survey on the Constitutional Right to Privacy in the Context of Homosexual Activity, 40 U. Miami L.Rev. 521–26 (1986).

The dissent's interpretation of *Hardwick*—that it authorizes the state to single out homosexual conduct for criminal sanction *because* that conduct is committed by homosexuals—is wide of the mark. *Hardwick* explicitly focused on the question whether the right to privacy extends constitutional protection to the commission of homosexual sodomy. *See* 106 S.Ct. at 2844–46. In essence, the dissent shifts *Hardwick*'s focus away from substantive due process and the right to privacy towards the right of homosexuals to enjoy equal treatment under the laws. Such an expansively anti-homosexual reading of *Hardwick* is unsupported and unfair both to homosexuals and the Supreme Court.

We also cannot agree with the dissent's assertion that the equal protection clause is entirely "procedural in nature" and that, therefore, our equal protection analysis is coherent "[o]nly if heterosexual sodomy is *not* protected by the right to privacy." *Dissent* at 1355 n. 5. However the Supreme Court defines the right to privacy—whether that definition includes a right to engage in heterosexual sodomy, homosexual sodomy, neither, or both—the equal protection clause imposes an independent obli-

gation on government not to draw invidious distinctions among its citizens. *See, e.g., Lehr v. Robertson,* 463 U.S. 248, 265, 103 S.Ct. 2985, 2995, 77 L.Ed.2d 614 (1983) ("The concept of equal justice under law requires the State to govern impartially"). We do not read *Hardwick* as in any way eroding that principle.

21. Dean John Hart Ely, for example, has severely criticized the Supreme Court's holding in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), while at the same time expressing the view that governmental classifications burdening homosexuals merit heightened scrutiny under the equal protection clause. *Compare* J. Ely, Democracy and Distrust 248 n. 52 (1980), *with id.* at 162–64, 93 S.Ct. at 731–32. *See generally infra note* [22].

22. *See generally* J. Ely, *supra* note 21, at 101–02 ("unlike an approach geared to the judicial imposition of 'fundamental values,' the representation-reinforcing [approach] ... is not inconsistent with, but to the contrary is entirely supportive of, the American system of representative democracy. It recognizes the unacceptability of the claim that appointed and life-tenured judges are better reflectors of conventional values than elected representatives, devoting itself instead to policing the mechanisms by which the system seeks to ensure that our elected representatives will actually represent.").

posed by equal protection, while not insignificant, do not involve the judiciary in the same degree of value-based line-drawing that the Supreme Court in *Hardwick* found so troublesome in defining the contours of substantive due process. In sum, the driving force behind *Hardwick* is the Court's ongoing concern with the expansion of rights under substantive due process, not an unbounded antipathy toward a disfavored group.

The Army also relies upon *Beller v. Middendorf,* 632 F.2d 788 (9th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981). This reliance, however, is misplaced because *Beller,* like *Hardwick,* is a substantive due process case, not an equal protection case. In rejecting a substantive due process challenge to Navy regulations providing for the discharge of personnel who engaged in homosexual acts, our court held in *Beller* that substantive due process required only that courts balance the governmental and individual interests at stake in a fashion similar to intermediate scrutiny. *Beller,* 632 F.2d at 805–12. As now-Justice Kennedy's carefully tailored opinion makes clear, Beller's appeal did "not require us to address the question whether consensual private homosexual conduct is a fundamental right as that term is used in equal protection.... [and was] not presented to us as implicating a suspect or quasi-suspect classification.... Substantive due process, not equal protection, was the basis of the constitutional claim, and we address the case in those terms." *Id.* at 807. Thus, *Beller,* like *Hardwick,* is clearly not precedent foreclosing Watkins' claim that challenged governmental regulations discriminate against a suspect class in violation of equal protection doctrine. *See Sethy v. Alameda County Water Dist.,* 545 F.2d 1157, 1159–60 (9th Cir.1976) (en banc) (a prior decision is not binding precedent on issues that were neither raised by counsel nor discussed in the opinion of the court); *Sakamoto v. Duty Free Shoppers,* 764 F.2d 1285, 1288 (9th Cir.1985) (same).

The Army further argues that our decision in *Hatheway v. Secretary of the Army,* 641 F.2d 1376 (9th Cir.), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981), forecloses Watkins' equal protection claim. Again, we cannot agree. In *Beller,* our court reserved two distinct equal protection questions: first, whether the challenged regulations penalizing homosexual conduct burdened the exercise of a fundamental or important substantive right to engage in certain conduct; second, whether the challenged regulations discriminated against a suspect or quasi-suspect class. As explained below, in *Hatheway* we clearly answered the first of these discrete equal protection questions. The Army argues, however, that *Hatheway* also decided the second question reserved in *Beller*—the question raised in Watkins' claim—whether homosexuals constitute a suspect or quasi-suspect class.[23]

Hatheway, a soldier convicted of committing sodomy in violation of 10 U.S.C. § 925, claimed that the Army was prosecuting cases involving homosexual sodomy while refusing to prosecute cases involving heterosexual sodomy. Our court "understood Hatheway's claim (that the commission of a homosexual act is an impermissible basis for prosecution) to be an equal protection argument," *Hatheway,* 641 F.2d at 1382, which we treated as resting on the branch of equal protection doctrine concerned with whether a governmental classification burdens a fundamental or important substantive right to engage in certain conduct. Thus, we explicitly characterized Hatheway's claim "that the commission of a homosexual act is an impermissible basis for prosecution" to be the sort of equal protection claim that "implicate[d] the 'right to be free ... from unwarranted intrusions into

---

**23.** Under equal protection doctrine, heightened scrutiny not only applies to legal classifications that burden suspect or quasi-suspect classes but also applies to classifications that burden the exercise of fundamental or important substantive rights to engage in certain conduct. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 216–17 & nn. 14–15, 102 S.Ct. 2382, 2394–95 & nn. 14–15, 72 L.Ed.2d 786 (1982); *Maher v. Roe,* 432 U.S. 464, 470–78, 97 S.Ct. 2376, 2380–85, 53 L.Ed.2d 484 (1977); L. Tribe, American Constitutional Law § 16–7, at 1002–03, § 16–31, at 1089–90 & n. 1 (1978).

one's privacy.' " 641 F.2d at 1382 (quoting *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247–48, 22 L.Ed.2d 542 (1969)). We then reasoned that the interest at stake in *Hatheway* was similar to the substantive interest at stake in *Beller*. 641 F.2d at 1382. Because in *Beller* we decided that under the due process clause the right to engage in homosexual conduct merited "heightened solicitude," but not strict scrutiny, in *Hatheway* we adopted this assessment for the purposes of our fundamental rights equal protection analysis. Accordingly, we applied intermediate scrutiny to the Army's actions and held that "the selection of cases involving homosexual acts for Article 125 prosecutions" was permissible because such prosecutions bore "a substantial relationship to an important government interest." *Id.* Thus, we rejected Hatheway's claim based on an analysis of the fundamental rights branch of equal protection doctrine, the branch of equal protection doctrine upon which Watkins *does not* rely.

The Army argues that we should nonetheless read *Hatheway* as precluding Watkins' claim that homosexuals constitute a suspect or quasi-suspect class. In support of this argument, the Army relies upon a single sentence in a footnote—the opinion's only reference to suspect class analysis. In footnote 6 we wrote: "Though '[t]he courts have not designated homosexuals a "suspect" or "quasi-suspect" classification so as to require more exacting scrutiny,' *DeSantis v. Pacific Tel. & Tel. Co.*, 608 F.2d 327, 333 (9th Cir.1979), heightened scrutiny is independently required where a classification penalizes the exercise of a fundamental right. *See Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969)." 641 F.2d at 1382 n. 6. Although we recognize that the intended purpose of this footnote is not entirely clear, we cannot fairly read this passing reference as an adjudication of the important and unresolved constitutional question whether homosexuals constitute a suspect or quasi-suspect class for the purpose of equal protection analysis. Rather, we read footnote 6 as simply clarifying the distinction between the suspect class and

fundamental rights branches of equal protection doctrine while acknowledging that at the time of the *Hatheway* decision courts had not yet decided whether homosexuals constitute a suspect or quasi-suspect class. That the critical language in footnote 6 is taken directly from our opinion in *DeSantis*, 608 F.2d 327, informs our reading. In *DeSantis*, we acknowledged that our court had not yet designated homosexuals as a suspect or quasi-suspect class, but we did not decide that homosexuals should not be so designated. *See infra* at 1344. Similarly, in footnote 6 of *Hatheway*, we remarked on the existing state of the law with respect to homosexuals without deciding the open question whether homosexuals constitute a suspect or quasi-suspect class. In other words, we read *Hatheway* as interpreting the equal protection claim presented as resting solely on the fundamental rights branch of equal protection analysis. *Hatheway* is also distinguishable from this case because, like *Hardwick* and *Beller*, *Hatheway* involved a classification based on homosexual conduct, not homosexual orientation. As we emphasize throughout our opinion, this distinction is critical to an analysis of Watkins' particular equal protection claim.

Because we read *Hatheway* as not deciding the suspect class issue, and because the suspect class and fundamental rights branches of equal protection doctrine involve very separate inquiries, *see, e.g., San Antonio School Indep. District v. Rodriguez*, 411 U.S. 1, 18–39, 93 S.Ct. 1278, 1288–1300, 36 L.Ed.2d 16 (1973); Perry, *Modern Equal Protection*, 79 Colum.L. Rev. 1023, 1074–83 (1979); *Developments in the Law—Equal Protection*, 82 Harv.L. Rev. 1065, 1087–1131 (1969), our general rules of *stare decisis* dictate that *Hatheway* is not controlling precedent for Watkins' equal protection claim based on the argument that homosexuals constitute a suspect or quasi-suspect class. *See Sethy*, 545 F.2d at 1159–60 (en banc); *Sakamoto*, 764 F.2d at 1288.

Finally, we reject the Army's contention that in *DeSantis v. Pacific Tel. & Tel. Co.*, 608 F.2d 327 (9th Cir.1979), our court held

that homosexuals do not constitute a suspect or quasi-suspect class. Rather, we held in *DeSantis* that homosexuals were not a protected class within the meaning of 42 U.S.C. § 1985(3), which secures a right of action against private parties who conspire to deprive "any person or class of persons of the equal protection of the laws." Although our interpretation of section 1985(3) turned in part on the observation that "[t]he courts *have not* designated homosexuals a 'suspect' or 'quasi-suspect' classification," 608 F.2d at 333 (emphasis added), we did not consider whether homosexuals *should be* designated a suspect class. Nor was it necessary to reach that issue because, under *DeSantis*'s interpretation of the statute, section 1985(3) protects only those groups that *have been* determined by the government to need special federal assistance in protecting their civil rights. 608 F.2d at 333.[24] Thus, our decision that section 1985(3) did not protect homosexuals turned simply on the point that courts had not *yet* designated homosexuals a suspect class. Although *DeSantis* does not articulate its reasons for requiring a *prior* governmental determination, it seems likely—since section 1985(3) authorizes suits against private individuals and requires no state action—that our court's interpretation of the statute was animated by concerns about providing potential defendants with sufficient notice of the statute's scope. *Cf. Marks v. United States*, 430 U.S. 188, 192, 97 S.Ct. 990, 993,

51 L.Ed.2d 260 (1977) (judicial enlargement of the scope of criminal statute without fair notice violates due process).

While neither the Supreme Court nor the Ninth Circuit has decided the question presented in Watkins' appeal—whether persons of homosexual orientation constitute a suspect class under equal protection doctrine—several other circuits have considered the different but related question whether laws burdening the class of individuals engaging in homosexual *conduct* trigger heightened scrutiny under the equal protection clause. Only one circuit, however, has given the issue more than cursory treatment.[25] In *Padula v. Webster*, 822 F.2d 97 (D.C.Cir.1987), the District of Columbia Circuit rejected an equal protection challenge to the FBI's policy of discriminating against "practicing homosexuals" in its hiring decisions. The D.C. Circuit did not analyze whether the class of persons engaging in homosexual conduct satisfies the traditional indicia of suspectness, *see infra* at 1345–49, but rather concluded summarily (as the Army and the dissent urge us to do here) that "[i]t would be quite anomalous, on its face, to declare status defined by conduct that states may constitutionally criminalize as deserving of strict scrutiny under the equal protection clause." *Id.* at 103. The D.C. Circuit reasoned that "[i]f the [Supreme] Court [in *Hardwick*] was unwilling to object to state

24. Along with subsequent cases, *DeSantis* has established that there are only two ways of making this showing under § 1985(3): (1) proving that Congress *has* enacted statutes offering special protection to the class; or (2) proving that courts *have* offered special protection to the class by designating it a suspect or quasi-suspect class. *Id.; see also Schultz v. Sundberg*, 759 F.2d 714, 718 (9th Cir.1985).

25. The Fifth and Tenth circuits have also considered this question. *Baker v. Wade*, 769 F.2d 289, 292 (5th Cir.1985) (en banc), *On Petition for Rehearing En Banc*, 774 F.2d 1285 (5th Cir.1985) (stressing that statute at issue was "directed at certain conduct, not at a class of people"), *cert. denied*, —— U.S. ——, 106 S.Ct. 3337–38, 92 L.Ed. 2d 742 (1986); *National Gay Task Force v. Board of Educ.*, 729 F.2d 1270, 1273 (10th Cir.1984) (statute at issue proscribes "public homosexual activity" by teachers), *aff'd without opinion by*

*an equally divided Court*, 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985). Both of these circuits held that discrimination based on homosexual conduct does not merit heightened scrutiny under the equal protection clause, but neither circuit attempted any serious analysis of the issue. *See Baker v. Wade*, 769 F.2d at 292 (noting merely that the plaintiff "has not cited any cases holding, and we refuse to hold, that homosexuals constitute a suspect or quasi-suspect classification"); *National Gay Task Force*, 729 F.2d at 1273 (stating summarily that classification based on choice of sexual partners could not be suspect because Supreme Court has not held gender to be a suspect classification); *see also Rich v. Secretary of the Army*, 735 F.2d 1220, 1229 (10th Cir.1984) (citing without explanation *National Gay Task Force, Hatheway,* and *DeSantis* for the proposition that a "classification based on one's choice of sexual partners is not suspect").

laws that criminalize the behavior that defines the class, it is hardly open to a lower court to conclude that state sponsored discrimination against the class is invidious. After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal." *Id.*

*Padula*'s reasoning, echoed in Judge Reinhardt's dissent, rests on the false premise that *Hardwick* approves discrimination against homosexuals. *See supra* at 1340. To repeat what we said above, *Hardwick* held only that the constitutionally protected right to privacy does not extend to homosexual sodomy. But we see no principled way to transmogrify the Court's holding that the state may criminalize specific sexual conduct commonly engaged in by homosexuals into a state license to pass "homosexual laws"—laws imposing special restrictions on gays because they are gay. *See supra* at [1340]; *see also infra* at [1346-47] (Army regulations do not burden a class defined by behavior subject to criminal sanction). Thus, we find *Padula* unpersuasive.

In sum, we conclude that no federal appellate court has decided the critical issue raised by Watkins' claim: whether persons of homosexual orientation constitute a suspect class under equal protection doctrine. To be sure, *Hardwick, Beller* and *Hatheway* foreclose Watkins from making either a due process or equal protection claim that the Army's regulations impinge on an asserted fundamental right to engage in homosexual sodomy. But Watkins makes no such claim. Rather, he claims only that the Army regulations discriminate against him because of his membership in a disfavored group—homosexuals. This claim is not barred by precedent.

## V

We now address the merits of Watkins' claim that we must subject the Army's regulations to strict scrutiny because homosexuals constitute a suspect class under equal protection jurisprudence. The Su-

preme Court has identified several factors that guide our suspect class inquiry.

The first factor the Supreme Court generally considers is whether the group at issue has suffered a history of purposeful discrimination. *See, e.g., Cleburne,* 473 U.S. at 441, 105 S.Ct. at 3255; *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566-67, 49 L.Ed.2d 520 (1976); *Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1294; *Frontiero,* 411 U.S. 677 at 684-85, 93 S.Ct. 1764, 1769, 36 L.Ed. 2d 583 (1973) (plurality). As the Army concedes,[26] it is indisputable that "homosexuals have historically been the object of pernicious and sustained hostility." *Rowland v. Mad River Local School Dist.,* 470 U.S. 1009, 1014, 105 S.Ct. 1373, 1377, 84 L.Ed.2d 392 (1985) (Brennan, J., dissenting from denial of cert.). More recently, Judge Henderson echoed the same harsh truth: "Lesbians and gays have been the object of some of the deepest prejudice and hatred in American society." *High Tech Gays v. Defense Industrial Security Clearance Office,* 668 F.Supp. 1361 (N.D.Cal.1987) (invalidating Defense Department practice of subjecting gay security clearance applicants to more exacting scrutiny than heterosexual applicants). Homosexuals have been the frequent victims of violence and have been excluded from jobs, schools, housing, churches, and even families. *See generally* Note, *An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality,* 57 S.Cal.L.Rev. 797, 824-25 (1984) (documenting the history of discrimination). In any case, the discrimination faced by homosexuals in our society is plainly no less pernicious or intense than the discrimination faced by other groups already treated as suspect classes, such as aliens or people of a particular national origin. *See, e.g., Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3255 (identifying suspect groups).

The second factor that the Supreme Court considers in suspect class analysis is difficult to capsulize and may in fact represent a cluster of factors grouped around a

**26.** *See* Army's Second Supplemental Brief at 10.

central idea—whether the discrimination embodies a gross unfairness that is sufficiently inconsistent with the ideals of equal protection to term it invidious. Considering this additional factor makes sense. After all, discrimination exists against some groups because the animus is warranted—no one could seriously argue that burglars form a suspect class. *See* Tribe, *The Puzzling Persistence of Process–Based Constitutional Theories,* 89 Yale L.J. 1063, 1075 (1980); Note, *supra,* at 814–15 & nn. 115–116. In giving content to this concept of gross unfairness, the Court has considered (1) whether the disadvantaged class is defined by a trait that "frequently bears no relation to ability to perform or contribute to society," *Frontiero,* 411 U.S. at 686, 93 S.Ct. at 1770 (plurality); (2) whether the class has been saddled with unique disabilities because of prejudice or inaccurate stereotypes; and (3) whether the trait defining the class is immutable. *See Cleburne,* 473 U.S. at 440–44, 105 S.Ct. at 3254–56; *Plyler,* 457 U.S. at 216 n. 14, 219 n. 19, 220, 223, 102 S.Ct. at 2394 n. 14, 2396 n. 19, 2396, 2398; *Murgia,* 427 U.S. at 313, 96 S.Ct. at 2567; *Frontiero,* 411 U.S. at 685–87, 93 S.Ct. at 1769–70 (plurality). We consider these questions in turn.

Sexual orientation plainly has no relevance to a person's "ability to perform or contribute to society." Indeed, the Army makes no claim that homosexuality impairs a person's ability to perform military duties. Sergeant Watkins' exemplary record of military service stands as a testament to quite the opposite. *See supra* at 1331, 1332–33. Moreover, as the Army itself concluded, there is not a scintilla of evidence that Watkins' avowed homosexuality "had either a degrading effect upon unit performance, morale or discipline, or upon his own job performance." ER at 26c.

This irrelevance of sexual orientation to the quality of a person's contribution to society also suggests that classifications based on sexual orientation reflect prejudice and inaccurate stereotypes—the second indicia of a classification's gross unfairness. *See Cleburne,* 473 U.S. at 440–41, 105 S.Ct. at 3255. We agree with Justice Brennan that "discrimination against homosexuals is 'likely ... to reflect deepseated prejudice rather than ... rationality.' " *Rowland,* 470 U.S. at 1014, 105 S.Ct. at 1377 (Brennan, J., dissenting from denial of cert.) (quoting *Plyler,* 457 U.S. at 216 n. 14, 102 S.Ct. at 2394 n. 14). The Army does not dispute the hard fact that homosexuals face enormous prejudice. Nor could it, for the Army justifies its regulations in part by asserting that straight soldiers despise and lack respect for homosexuals and that popular prejudice against homosexuals is so pervasive that their presence in the Army will discourage enlistment and tarnish the Army's public image. *See* Army's Opening Brief at 17–18, 19 n. 9, 30, 30–31 n. 18; Army's Second Supp. Brief at 30–31 & n. 17; AR 635–200, ¶ 15–1(a). Instead, the Army suggests that the public opprobrium directed towards gays does not constitute prejudice in the pejorative sense of the word, but rather represents appropriate public disapproval of persons who engage in immoral behavior. The Army equates homosexuals with sodomists and justifies its regulations as simply reflecting a rational bias against a class of persons who engage in criminal acts of sodomy. In essence, the Army argues that homosexuals, like burglars, cannot form a suspect class because they are criminals.

The Army's argument, essentially adopted by the dissent, rests on two false premises. First, the class burdened by the regulations is defined by the sexual *orientation* of its members, not by their sexual conduct. *See supra* at 1336–39. To our knowledge, homosexual orientation itself has never been criminalized in this country. Moreover, any attempt to criminalize the status of an individual's sexual orientation would present grave constitutional problems. *See generally Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

Second, little of the homosexual *conduct* covered by the regulations is criminal. The regulations reach many forms of homosexual conduct other than sodomy such as kissing, handholding, caressing, and hand-genital contact. Yet, sodomy is the only

consensual adult sexual conduct that Congress has criminalized, 10 U.S.C. § 925. Indeed, the Army points to no law, federal or state, which criminalizes any form of private consensual homosexual behavior other than sodomy. The Army's argument that its regulations legitimately discriminate solely against criminals might be relevant if the class at issue were limited to sodomists. But the class banned from Army service is not composed of sodomists, or even of homosexual sodomists; the class is composed of persons of homosexual orientation whether or not they have engaged in sodomy. As the record in this case makes clear, the Army has no proof that Watkins has ever engaged in any act of sodomy—homosexual or heterosexual. *See supra* at 1332–33 & n. 2. Nonetheless, the regulations mandated his discharge and the denial of his reenlistment application.

Finally, we turn to immutability as an indicator of gross unfairness. The Supreme Court has never held that only classes with immutable traits can be deemed suspect. *Cf., e.g., Cleburne,* 473. U.S. at 442 n. 10, 105 S.Ct. at 3256, n. 10 (casting doubt on immutability theory); *id.* at 440–41, 105 S.Ct. at 3255 (stating the defining characteristics of suspect classes without mentioning immutability); *Murgia,* 427 U.S. at 313, 96 S.Ct. at 2566–67 (same); *Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1294 (same). We nonetheless consider immutability because the Supreme Court has often focused on immutability, *see, e.g., Plyler,* 457 U.S. at 220, 102 S.Ct. at 2396; *Frontiero,* 411 U.S. at 686, 93 S.Ct. at 1770 (plurality), and has sometimes described the recognized suspect classes as having immutable traits, *see, e.g., Parham v. Hughes,* 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed. 2d 269 (1979) (plurality opinion) (describing race, national origin, alienage, illegitimacy, and gender as immutable).

■ Although the Supreme Court considers immutability relevant, it is clear that by "immutability" the Court has never meant strict immutability in the sense that members of the class must be physically unable to change or mask the trait defining their class. People can have operations to change their sex. Aliens can ordinarily become naturalized citizens. The status of illegitimate children can be changed. People can frequently hide their national origin by changing their customs, their names, or their associations. Lighter skinned blacks can sometimes "pass" for white, as can Latinos for Anglos, and some people can even change their racial appearance with pigment injections. *See* J. Griffin, Black Like Me (1977). At a minimum, then, the Supreme Court is willing to treat a trait as effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity. Reading the case law in a more capacious manner, "immutability" may describe those traits that are so central to a person's identity that it would be abhorrent for government to penalize a person for refusing to change them, regardless of how easy that change might be physically. Racial discrimination, for example, would not suddenly become constitutional if medical science developed an easy, cheap, and painless method of changing one's skin pigment. *See* Tribe, *supra,* at 1073–74 n. 52. *See generally* Note, *The Constitutional Status of Sexual Orientation: Homosexuality as a Suspect Classification,* 98 Harv.L.Rev. 1285, 1303 (arguing that the ability to change a trait is not as important as whether the trait is a "determinative feature of personality").

Under either formulation, we have no trouble concluding that sexual orientation is immutable for the purposes of equal protection doctrine. Although the causes of homosexuality are not fully understood, scientific research indicates that we have little control over our sexual orientation and that, once acquired, our sexual orientation is largely impervious to change. *See* Note, *supra,* 57 S.Cal.L.Rev. at 817–821 (collecting sources); *see also* L. Tribe, *supra* note 20, at 945 n. 17. Scientific proof aside, it seems appropriate to ask whether heterosexuals feel capable of changing *their* sexual orientation. Would heterosexuals living in a city that passed an ordinance banning those who engaged in or desired to engage in sex with persons of the *opposite* sex find it easy not only to

abstain from heterosexual activity but also to shift the object of their sexual desires to persons of the same sex? It may be that some heterosexuals and homosexuals can change their sexual orientation through extensive therapy, neurosurgery or shock treatment. *See* L. Tribe, *supra* note 23, at 945 n. 17. *But see* Note, *supra,* 57 S.Cal.L. Rev. at 820–21 & nn. 147–149. But the possibility of such a difficult and traumatic change does not make sexual orientation "mutable" for equal protection purposes. To express the same idea under the alternative formulation, we conclude that allowing the government to penalize the failure to change such a central aspect of individual and group identity would be abhorrent to the values animating the constitutional ideal of equal protection of the laws.

The final factor the Supreme Court considers in suspect class analysis is whether the group burdened by official discrimination lacks the political power necessary to obtain redress from the political branches of government. *See, e.g., Cleburne,* 473 U.S. at 441, 105 S.Ct. at 3255; *Plyler,* 457 U.S. at 216 n. 14, 102 S.Ct. at 2394 n. 14; *Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1294. Courts understandably have been more reluctant to extend heightened protection under equal protection doctrine to groups fully capable of securing their rights through the political process. In evaluating whether a class is politically underrepresented, the Supreme Court has focused on whether the class is a "discrete and insular minority." *See, e.g., Murgia,* 427 U.S. at 313, 96 S.Ct. at 2567; *Examining Board v. Flores de Otero,* 426 U.S. 572, 602, 96 S.Ct. 2264, 2281, 49 L.Ed.2d 65 (1976); *see generally United States v. Carolene Products,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938).

The Court has held, for example, that old age does not define a discrete and insular group because "it marks a stage that each of us will reach if we live out our normal span." *Murgia,* 427 U.S. at 313–14, 96 S.Ct. at 2567. By contrast, most of us are not likely to identify ourselves as homosexual at any time in our lives. Thus, many of us, including many elected officials, are likely to have difficulty understanding or empathizing with homosexuals. Most people have little exposure to gays, both because they rarely encounter gays [27] and because the gays they do encounter may feel compelled to conceal their sexual orientation. In fact, the social, economic, and political pressures to conceal one's homosexuality commonly deter many gays from openly advocating pro-homosexual legislation, thus intensifying their inability to make effective use of the political process. *Cf.* J. Ely, *supra* note 21, at 163–64. "Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena." *Rowland,* 470 U.S. at 1014, 105 S.Ct. at 1377 (Brennan, J., dissenting from denial of cert.).[28]

Even when gays overcome this prejudice enough to participate openly in politics, the general animus towards homosexuality may render this participation wholly ineffective. Elected officials sensitive to public prejudice may refuse to support legislation that even appears to condone homosexuality. *See* Note, *supra,* 98 Harv.L.Rev. at 1304 n. 96. Indeed, the Army itself argues that its regulations are justified by the need to "maintain the public acceptability of military service," AR 635–200, ¶ 15–2(a), because "toleration of homosexual conduct ... might be understood as tacit approval"

---

**27.** Because homosexuals are a minority and are frequently excluded from jobs, schools, churches, and heterosexual social circles, *see supra* at 1346, heterosexuals generally have relatively few opportunities to meet homosexuals and overcome any prejudices against homosexuality.

**28.** *See also Adolph Coors Co. v. Wallace,* 570 F.Supp. 202, 209 n. 24 (N.D.Cal.1983) ("Homo-

sexuals attempting to form associations to represent their political and social beliefs, free from fatal reprisals for their sexual orientation" constitute discrete and insular minority meriting special protection under *U.S. v. Carolene Products Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938) (Williams, J.)).

and "the existence of homosexual units might well be a source of ridicule and notoriety." Army's Opening Brief at 17, 19 n. 9, 30–31 n. 18. These barriers to political power are underscored by the underrepresentation of avowed homosexuals in the decisionmaking bodies of government and the inability of homosexuals to prevent legislation hostile to their group interests.[29] *See Frontiero,* 411 U.S. at 686 & n. 17, 93 S.Ct. at 1770 & n. 17 (plurality) (underrepresentation of women in government caused in part by history of discrimination); *Cleburne,* 473 U.S. at 445, 105 S.Ct. at 3257 (reasoning that the existence of legislation responsive to the needs of the mentally disabled belied the claim that they were politically powerless).

■ In sum, our analysis of the relevant factors in determining whether a given group should be considered a suspect class for the purposes of equal protection doctrine ineluctably leads us to the conclusion that homosexuals constitute such a suspect class. We find not only that our analysis of each of the relevant factors supports our conclusion, but also that the principles underlying equal protection doctrine—the principles that gave rise to these factors in the first place—compel us to conclude that homosexuals constitute a suspect class. *See also* J. Ely, *supra* note 21, at 162–64 (classifications based on homosexuality merit heightened scrutiny); L. Tribe, *supra* note 23, at 944–45 n. 17 (1978) (same).

## VI

Having concluded that homosexuals constitute a suspect class, we must subject the Army's regulations facially discriminating against homosexuals to strict scrutiny. Consequently, we may uphold the regulations only if " *'necessary* to promote a

*compelling* governmental interest.' " *Dunn v. Blumstein,* 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972) (quoting *Shapiro,* 394 U.S. at 634, 89 S.Ct. at 1331); *see also University of Calif. Regents v. Bakke,* 438 U.S. 265, 357, 98 S.Ct. 2733, 2782, 57 L.Ed.2d 750 (1978) (Opinion of Brennan, White, Marshall & Blackmun, JJ.). The requirement of necessity means that no less restrictive alternative is available to promote the compelling governmental interest. *See Dunn,* 405 U.S. at 343, 92 S.Ct. at 1003; *Bakke,* 438 U.S. at 357, 98 S.Ct. at 2782 (Opinion of four justices).

We recognize that even under strict scrutiny, our review of military regulations must be more deferential than comparable review of laws governing civilians. *See Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986). While the Supreme Court does not "purport to apply a different equal protection test because of the military context, [it does] stress the deference due congressional choices among alternatives in exercising the congressional authority to raise and support armies and make rules for their governance." *Rostker v. Goldberg,* 453 U.S. 57, 71, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981) (citing *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975)). We question whether this special deference is appropriate in Watkins' case given that Congress has chosen not to regulate homosexuality or any form of sexual conduct engaged in by military personnel save for one exception—Congress has chosen to criminalize sodomy by military personnel whether committed "with another person *of the same or opposite* sex." 10 U.S.C. § 925 (emphasis added). Hence, if anything, section 925 reflects an absence of

---

**29.** The Army claims that homosexuals cannot be politically powerless because two states, Wisconsin and California, have passed statutes prohibiting discrimination against homosexuals. Two state statutes do not overcome the long and extensive history of laws discriminating against homosexuals in all fifty states. *See, e.g.,* Note, *supra,* 57 S.Cal.L.Rev. at 803–07. Moreover, at the national level—the relevant political level for seeking protection from military discrimination—homosexuals have been wholly unsuccess-

ful in getting legislation passed that protects them from discrimination.

The Army also argues that the repeal of sodomy statutes by many states proves that homosexuals are not politically powerless. However, sodomy statutes restrict the sexual freedom of heterosexuals as well as homosexuals. The repeal of sodomy statutes may thus reflect the liberalization of attitudes about heterosexual behavior more than it reflects the political power of homosexuals.

congressional intent to discriminate on the basis of sexual orientation.

In any case, even granting special deference to the policy choices of the military, we must reject many of the Army's asserted justifications because they illegitimately cater to private biases. For example, the Army argues that it has a valid interest in maintaining morale and discipline by avoiding hostilities and "'tensions between known homosexuals and other members [of the armed services] who despise/detest homosexuality.'" Army's Opening Brief at 17 (quoting and incorporating into their argument *Beller*, 632 F.2d at 811); *see also id.* at 17–18, 19 n. 9, 30, 30–31 n. 18; Army's Second Supp. Brief at 30–31 & n. 17; AR 635–200, ¶ 15–1(a).[30] The Army also expresses its "'doubts concerning a homosexual officer's ability to command the respect and trust of the personnel he or she commands'" because many lower-ranked heterosexual soldiers despise and detest homosexuality. *See* Army's Second Supp. Brief at 30–31 (quoting and incorporating *Beller*, 632 F.2d at 811); *see also id.* at 31 n. 17; Army's Opening Brief at 17–

18, 19 n. 9, 30; AR 635–200, ¶ 15–1(a). Finally, the Army argues that the presence of gays in its ranks "might well be a source of ridicule and notoriety, harmful to the Army's recruitment efforts" and to its public image. Army's Opening Brief at 31 n. 18; *see also id.* at 15, 17, 19 n. 9, 30; AR 635–200, ¶ 15–1(a).[31]

These concerns strike a familiar chord. For much of our history, the military's fear of racial tension kept black soldiers separated from whites. *benShalom v. Secretary of the Army*, 489 F.Supp. 964, 976 (E.D.Wis.1980). As recently as World War II both the Army chief of staff and the Secretary of the Navy justified racial segregation in the ranks as necessary to maintain efficiency, discipline, and morale. *See* G. Ware, William Hastie: Grace Under Pressure 99, 134 (1984).[32] Today, it is unthinkable that the judiciary would defer to the Army's prior "professional" judgment that black and white soldiers had to be segregated to avoid interracial tensions. Indeed, the Supreme Court has decisively rejected the notion that private prejudice

---

**30.** A somewhat different rationale conceivably could also underlie certain cryptic statements the Army makes about its concerns regarding "close conditions affording minimal privacy," "'potential for difficulties arising out of possible close confinement,'" and "the intimacy of barrack's life." AR 635–200, ¶ 15–1(a); Army's Opening Brief at 15 (quoting *Beller*, 632 F.2d at 812); Army's Second Supp. Brief at 19 n.9, 30. Conceivably, the Army could be concerned in part that the presence of gays in the ranks will create *sexual* tensions—as distinguished from tensions arising from prejudice—because of the practical necessity of housing gays with personnel of the same sex. The Army, however, never articulates this concern. Thus it gives no indication that it regards this concern as compelling or that it believes that weeding *all* homosexuals out of the military—even soldiers as exemplary as Sergeant Watkins—is necessary to advance a compelling military interest in reducing sexual tensions. Indeed, at points in its argument the Army implies that it is concerned about the close confinement of soldiers only insofar as such confinement might exacerbate hostilities and tensions assertedly created by the prejudice some heterosexuals have against homosexuals. *See* Army's Opening Brief at 17, 31 n. 18. Even if the Army had raised the argument that excluding homosexuals from barracks reduces sexual tension and had shown that reducing sexual tension serves a compelling interest,

nothing in the record even suggests that a per se rule banning all homosexuals from the Army would be the least restrictive method of advancing this interest.

**31.** *Goldman* and *Rostker* do not, as the dissent suggests, require us to be so deferential to the military that even under strict scrutiny we cannot overturn the "'considered professional judgment' of the Army as to what kind of persons should be barred from enlisting to insure a disciplined fighting force." *Id.* at 18. This cannot be the law. If the military decided to exclude blacks from its ranks because their presence allegedly undermined morale, the judiciary would be helpless to strike down the action. *Goldman* and *Rostker* require judicial deference, not the abdication of our Article III duty to hold the other branches of government, even the military, accountable to the Constitution.

**32.** It took an Executive Order in 1945 by President Truman, issued against the advice of almost every admiral and general, to integrate our armed forces. M. Miller, *Plain Speaking: An Oral Biography of Harry S. Truman* 79 (1983). It is also interesting to note that during World War II the Army deliberately minimized any publicity about the existence of black soldiers because it feared that such publicity would tarnish the Army's public image. *See* G. Ware, *supra,* at 100.

against minorities can ever justify official discrimination, even when those private prejudices create real and legitimate problems. *See Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984).

In *Palmore*, a state granted custody of a child to her father because her white mother had remarried a black man. The state rested its decision on the best interests of the child, reasoning that, despite improvements in race relations, the social reality was that the child would likely suffer social stigmatization if she had parents of different races. A unanimous Court, in an opinion by Chief Justice Burger, conceded the importance of the state's interest in the welfare of the child, but nonetheless reversed with the following reasoning:

> "It would ignore reality to suggest that racial and ethnic prejudices do not exist or that all manifestations of those prejudices have been eliminated.... The question, however, is whether the reality of private biases and the possible injury they might inflict are permissible considerations for removal of an infant child from the custody of its natural mother. We have little difficulty concluding that they are not. The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."

*Id.* at 433, 104 S.Ct. at 1882. Thus, *Palmore* forecloses the Army from justifying its ban on homosexuals on the ground that private prejudice against homosexuals would somehow undermine the strength of our armed forces if homosexuals were permitted to serve. *See also Cleburne*, 473 U.S. at 448, 105 S.Ct. at 3259 (even under rationality review of discrimination against group that is neither suspect nor quasi-suspect, catering to private prejudice is not a cognizable state interest).[33]

The Army's defense of its regulations, however, goes beyond its professed fear of prejudice in the ranks. Apparently, the Army believes that its regulations rooting out persons with certain sexual tendencies are not merely a response to prejudice, but are also grounded in legitimate moral norms. In other words, the Army believes that its ban against homosexuals simply codifies society's moral consensus that homosexuality is evil. Yet, even accepting *arguendo* this proposition that anti-homosexual animus is grounded in morality (as opposed to prejudice masking as morality), equal protection doctrine does not permit notions of majoritarian morality to serve as compelling justification for laws that discriminate against suspect classes.

A similar principle animates *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), in which the Supreme Court struck down a Virginia statute outlawing marriages between whites and blacks. Although the Virginia legislature may have adopted this law in the sincere belief that miscegenation—the mixing of racial blood lines—was evil, this moral judgment could not justify the statute's discrimination on the basis of race. Like the Army's regulations proscribing sexual acts only when committed by homosexual couples, the Virginia statute proscribed marriage only when undertaken by mixed-race couples. In both cases, the government did not prohibit certain conduct, it prohibited certain conduct selectively—only when engaged in by certain classes of people. Although courts may sometimes have to accept society's moral condemnation as a justification even when the morally condemned activity causes no harm to interests outside notions of morality, *see Hardwick*, 106 S.Ct. at 2846 (accepting moral condemnation as justification under rationality review), our deference to majoritarian

---

**33.** According to the dissent, our decisions in *Beller* and *Hatheway* preclude us from rejecting the Army's purported justifications as illegitimate. "*Beller* and *Hatheway*," the dissent contends, "both approve discriminatory treatment against homosexuals, by the military, which is based on moral judgments regarding homosexuality and homosexual conduct." *Dissent* at

1360. To the extent that these cases countenance rationales based on prejudice such as potential tension between homosexuals and soldiers who detest homosexuality or the potential adverse impact of homosexual soldiers on military recruiting, *Beller* and *Hatheway* are undermined by both *Palmore* and *Cleburne*—subsequent Supreme Court decisions.

notions of morality must be tempered by equal protection principles which require that those notions be applied evenhandedly. Laws that limit the acceptable focus of one's sexual desires to members of the opposite sex, like laws that limit one's choice of spouse (or sexual partner) to members of the same race, cannot withstand constitutional scrutiny absent a compelling governmental justification. This requirement would be reduced to a nullity if the government's assertion of moral objections only to interracial couples or only to homosexual couples could itself serve as a tautological basis for the challenged classification.

The Army's remaining justifications for discriminating against homosexuals may not be illegitimate, but they bear little relation to the regulations at issue. For example, the Army argues that military discipline might be undermined if emotional relationships developed between homosexuals of different military rank. Army's Opening Brief at 17–18, 19 n. 9, 30; AR 635–200, ¶ 15–1(a). Although this concern might be a compelling and legitimate military interest, the Army's regulations are poorly tailored to advance that interest. No one would suggest that heterosexuals are any less likely to develop emotional attachments within military ranks than homosexuals. Yet the Army's regulations do not address the problem of emotional attachments between male and female personnel, which presumably place similar stress on military discipline. Surely, the Army's interest in preventing emotional relationships that could erode military discipline would be advanced much more directly by a ban on all sexual contact between members of the same unit, whether between persons of the same or opposite sex. *Cf. Cleburne,* 473 U.S. at 449–50, 105 S.Ct. at 3259–60

(rejecting certain asserted justifications under *rationality* review where the justification would extend to other groups but the challenged classification did not). Here the Army regulations disqualify all homosexuals whether or not they have developed any emotional or sexual liaisons with other soldiers.

Also bearing little relation to the regulations is the Army's professed concern with breaches of security. AR 635–200, ¶ 15–1(a). Certainly the Army has a compelling interest in excluding persons who may be susceptible to blackmail. It is evident, however, that homosexuality poses a special risk of blackmail only if a homosexual is secretive about his or her sexual orientation. The Army regulations do nothing to lessen this problem. Quite the opposite, the regulations ban homosexuals only after they have declared their homosexuality or have engaged in known homosexual acts. The Army's concern about security risks among gays could be addressed in a more sensible and less restrictive manner by adopting a regulation banning only those gays who had lied about or failed to admit their sexual orientation.[34] In that way, the Army would *encourage,* rather than discourage, declarations of homosexuality, thereby reducing the number of closet homosexuals who might indeed pose a security risk.[35]

## CONCLUSION

■ We hold that the Army's regulations violate the constitutional guarantee of equal protection of the laws because they discriminate against persons of homosexual orientation, a suspect class, and because the regulations are not necessary to promote a legitimate compelling governmental interest. We thus reverse the district court's rulings denying Watkins' motion

---

**34.** Watkins has forthrightly reported his homosexuality since his induction in 1967, and his homosexuality was always a matter of common knowledge. *See supra* at 1331–32. There is no suggestion in the record before us that Watkins ever feared public disclosure of his homosexuality.

**35.** Moreover, even if banning homosexuals could lessen security risks, there appears to be

no reason for treating homosexuality as a nonwaivable disqualification from military service while treating other more serious potential sources of blackmail as waivable disqualifications. *See* AR 635–200, ¶ 14–12(c) & (d) (making drug abuse and the commission of other serious military offenses waivable disqualifications).

for summary judgment and granting summary judgment in favor of the Army, and remand with instructions to enter a declaratory judgment that the Army Regulations AR 635–200, Chapter 15, and 601–280, ¶ 2–21(c), are constitutionally void on their face, and to enter an injunction requiring the Army to consider Watkins' reenlistment application without regard to his sexual orientation. The district court shall also consider any unresolved claims of Watkins' such as whether the Army acted unlawfully in revoking his security clearance.

REVERSED AND REMANDED.

REINHARDT, Circuit Judge, dissenting.

With great reluctance, I have concluded that I am unable to concur in the majority opinion.[1] Like the majority, I believe that homosexuals have been unfairly treated both historically and in the United States today. Were I free to apply my own view of the meaning of the Constitution and in that light to pass upon the validity of the Army's regulations, I too would conclude that the Army may not refuse to enlist homosexuals. I am bound, however, as a circuit judge to apply the Constitution as it has been interpreted by the Supreme Court and our own circuit, whether or not I agree with those interpretations. Because of this requirement, I am sometimes compelled to reach a result I believe to be contrary to the proper interpretation of constitutional principles. This is, regrettably, one of those times.

**I.**

In this case we consider the constitutionality of a regulation which bars homosexuals from enlisting in the Army. Sergeant Perry Watkins challenges that regulation under the Equal Protection Clause. The majority holds that homosexuals are a suspect class, and that the regulation cannot survive strict scrutiny. Because I am compelled by recent Supreme Court and Ninth Circuit precedent to conclude first, that homosexuals are not a suspect class and second, that the regulation survives both rational and intermediate level scrutiny, I must dissent.

*Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), is the landmark case involving homosexual conduct. In *Hardwick,* the Supreme Court decided that homosexual sodomy is not protected by the right to privacy, and thus that the states are free to criminalize that conduct. Because Hardwick did not challenge the Georgia sodomy statute under the Equal Protection Clause, and neither party presented that issue in its briefs or at oral argument, the Court limited its holding to due process and properly refrained from reaching any direct conclusion regarding an equal protection challenge to the statute.[2] *See id.* 106 S.Ct. at 2846 n. 8. However, the fact that *Hardwick* does not address the equal protection question directly

---

1. The original majority opinion and dissent were formerly reported at 837 F.2d 1428. In its Petition for Rehearing, the Government pointed out that Watkins admitted to having engaged in homosexual sodomy with other servicemen while in the Army. The panel had previously been under the impression that Watkins had committed only "unspecified" homosexual acts. The majority has chosen to amend its opinion to reflect the information the government called to our attention, and to make several changes in the text of the opinion. Because the case has been taken en banc and a new opinion will be issued for the court, I see no purpose in my making parallel changes in the dissent. Instead, I simply observe that Watkins' admissions make the applicability of *Hatheway, Hardwick* and the Army's regulations even more appropriate than I had previously thought.

2. *Cf.* L. Tribe, *American Constitutional Law* § 15–21, at 1431 n. 7 (2nd ed. 1988) [hereinafter, *Constitutional Law* ]:

   The *Hardwick* majority's notation that no equal protection issue was before the Court should not be taken to mean that the Justices would have been interested in resolving it if it had been. For the Court denied *certiorari* that same term in *Baker v. Wade,* 769 F.2d 289 (5th Cir.1985) (en banc), *rehearing en banc denied,* 774 F.2d 1285 (5th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986), which involved a Texas law ... that targeted only homosexual acts. In his treatise, Professor Tribe notes, in the interest of full disclosure, that he served as Hardwick's counsel before the Supreme Court.

does not mean that the case is not of substantial significance to such an inquiry.

An important part of the function of circuit court judges is to interpret the Supreme Court's opinions. In doing so, we must attempt to understand the principles underlying those opinions, so that we may determine how past decisions affect subsequent cases. With respect to *Hardwick*, the majority balks at performing this task. Instead, it states: "the *Hardwick* Court simply did not address either the question whether heterosexual sodomy also falls outside the scope of the right to privacy or the separate question whether homosexual but not heterosexual sodomy may be criminalized without violating the equal protection clause." Maj. op. at 1340. The duty to interpret Supreme Court precedent cannot be so easily avoided. Logic and reason are among the tools available to judges who wish to determine the meaning of cases.

The answer to the meaning of *Hardwick* is not difficult to find. There are only two choices: either *Hardwick* is about "sodomy", and heterosexual sodomy is as constitutionally unprotected as homosexual sodomy, or it is about "homosexuality", and there are some acts which are protected if done by heterosexuals but not if done by homosexuals. In applying the opinion to future cases our first effort must be to decide which of the two propositions *Hardwick* stands for.[3] Although the majority refuses to acknowledge that it is making a choice, there can be no doubt that it does so. The sentence after the text quoted above reads: "We cannot read *Hardwick* as standing for the proposition that government may outlaw sodomy only when committed by a disfavored class of persons."[4] Maj. op. at 1340. By expressly rejecting the "homosexuality" option, the majority implicitly but necessarily selects the "sodomy" alternative. I do not believe that *Hardwick* can reasonably be so construed.

In my opinion, *Hardwick must* be read as standing precisely for the proposition the majority rejects. To put it simply, I believe that after *Hardwick* the government may outlaw homosexual sodomy even though it fails to regulate the private sexual conduct of heterosexuals. In *Hardwick* the Court took great care to make clear that it was saying only that *homosexual* sodomy is not constitutionally protected, and not that all sexual acts—both heterosexual and homosexual—that fall within the definition of sodomy can be prohibited.

The Georgia statute at issue in *Hardwick* on its face barred all acts of sodomy. The Court could simply have upheld the statute without even mentioning the word "homosexual". Instead it carefully crafted its opinion to proscribe and condemn only *homosexual* sodomy. While it can be argued that the Court was faced with only a homosexual sodomy case, under the majority's theory the fact that the particular act of sodomy was homosexual in nature is of no significance. According to the majority, the race and sexual preference of the defendant are equally irrelevant. The majority says: "Surely, for example, *Hardwick* cannot be read as a license to outlaw sodomy only when committed by blacks." Maj. op. at 1340. Surely not. And surely, had Hardwick been black rather than a homosexual, the Court would not, throughout its opinion, have written about "black sodomy" or black sodomists. It would simply have written about sodomy. Here, however, from the Court's standpoint the crucial fact was that Hardwick was a homosexual. For that reason, throughout its opinion the Court wrote about "homosexual sodomy".

It is significant that whatever one may think of the soundness of *Hardwick*'s assumptions or conclusions, the decision came as no surprise to those familiar with the rulings of the lower federal courts on the subject of homosexual rights. Well before

---

3. Ultimately, as far as the case before us is concerned, the result is the same regardless of which choice we make. *See* note 11, *infra.* However, the analysis by which we reach that result differs substantially.

4. *But see Baker v. Wade, supra* note 2, where the Fifth Circuit, sitting en banc, considered and rejected the claims that homosexuals are a suspect class and that a statute that criminalized homosexual sodomy but not heterosexual sodomy violates equal protection.

*Hardwick*, this court, along with most other federal courts, had concluded that the Supreme Court had determined that the right to privacy was inapplicable to homosexual conduct. As we said in *Beller v. Middendorf*, 632 F.2d 788, 809–10 (9th Cir. 1980), "Most federal courts ... have understood the holding [in *Doe v. Commonwealth's Attorney*, 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976)] to be that homosexual conduct does not enjoy special constitutional protection under the due process clause."

The anti-homosexual thrust of *Hardwick*, and the Court's willingness to condone anti-homosexual animus in the actions of the government, are clear. A prominent constitutional scholar makes this point succinctly. Professor Laurence Tribe, after strongly criticizing the Court's holding and reasoning in *Hardwick*, states that the "'good news' about the Court's decision" is that it was so clearly based on prejudice against homosexuals that it "may therefore pose less of a threat to other privacy precedents than would otherwise be the case." *Constitutional Law, supra,* § 15–21, at 1430. Justice Blackmun characterized the decision as being "obsessively focus[ed] on homosexual activity", and "proceed[ing] on the assumption that homosexuals are so different from other citizens that their lives may be controlled in a way that would not be tolerated if it limited the choices of ... other citizens." *Hardwick*, 106 S.Ct. at 2849 (Blackmun, J., dissenting). Indeed, it is hard to find any basis in the Court's opinion for interpreting it the way the majority chooses: the Court says explicitly that the statute is justified by "majority

sentiments about homosexuality", 106 S.Ct. at 2846, not by "majority sentiments about sodomy".

My colleagues' interpretation of *Hardwick* is not only unsound, it also unnecessarily and incorrectly increases—exponentially—the damage to the right to privacy caused by *Hardwick*. While in *Hardwick* the Court made it clear that homosexual conduct is not protected by the right to privacy, the Court has never held that the government has the authority to regulate the private heterosexual acts of consenting adults. *See Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *see also Hardwick*, 106 S.Ct. at 2857–58 (Stevens, J., dissenting). To the contrary, it has expressly stated that "intimate relationships" (though apparently only of the heterosexual variety) are constitutionally protected. *See Board of Directors of Rotary International v. Rotary Club*, —— U.S. ——, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987). Reading *Hardwick* as implicitly permitting the regulation of heterosexual conduct, as the majority's analysis forces it to do, constitutes a serious retreat in the privacy area.[5] If the majority's interpretation of *Hardwick* were correct, states could, for example, criminalize the act of oral sex when engaged in by heterosexuals, including married couples, and in fact would be required to do so if they wished to criminalize homosexual sodomy. Moreover, states would be required

5. The majority's disingenuous statement that it reads *Hardwick* neither one way nor the other on this point, maj. op. at 1340 n. 20, is simply neither logical nor credible. Only if heterosexual sodomy is *not* protected by the right to privacy could the majority's equal protection argument conceivably have any validity. If the right to privacy does apply in the case of heterosexuals who, for example, engage in oral sex, then the equal protection clause obviously does not require equal treatment of homosexual and heterosexual sexual conduct. The clause is procedural in nature and cannot afford substantive rights to a particular group when the Constitution does not otherwise provide them. To put it differently, if one group's sexual conduct is pro-

tected by the right to privacy and the other's is not, it is the Constitution itself that distinguishes between the treatment the two groups constitutionally receive. We cannot, then, use the equal protection clause to say that the two groups must be treated identically with respect to that conduct. Since the Court has already held that homosexuals are not protected by the privacy provisions of the Constitution when they commit sodomy, the right to equal treatment exists only if heterosexuals are similarly unprotected. Thus the majority's argument that equal protection applies is *necessarily* premised on the view that heterosexual sodomy, including oral sex between married couples, is not protected by the right to privacy and may be criminalized.

to enforce these statutes equally, against heterosexuals and homosexuals alike,[6] a practice not heretofore common in our society. I view the Constitution differently than the majority apparently does: I believe the Constitution protects most, if not all, private heterosexual acts between consenting adults.

The majority opinion undermines the right to privacy in another way. In its eagerness to promote its equal protection analysis and to bolster its characterization of *Hardwick* as an anti-privacy decision, it terms equal protection more objective and more democratic than substantive due process, which it describes as "value-based line-drawing" arising not from the Constitution itself but from "judicial fiat". Maj. op. at 1341. It is not necessary to denigrate the right to privacy in order to appreciate the importance of the equal protection clause. The majority's attack on substantive due process is unreasoned and unjustified.[7] As the Supreme Court has made clear on numerous occasions, the right to privacy is a fundamental part of our constitutional protections, originating in the First, Third, Fourth, Fifth, and Ninth Amendments, and of course the due process clause of the Fourteenth Amendment. *See, e.g., Griswold v. Connecticut*, 381 U.S. at 484–85, 85 S.Ct. at 1681–82. The protections guaranteed by the right to privacy are no less central to the Constitution than those guaranteed by the equal protection clause. *See generally* Note, "Process, Privacy, and the Supreme Court", 28 *B.C. L.Rev.* 691 (1987). Also, notwithstanding

the views of Dean Ely, *see* maj. op. at 1341 ns. 21, 22, most commentators agree that equal protection analysis is no more objective and no less difficult to apply than substantive due process analysis. *See, e.g.,* Tribe, "The Puzzling Persistence of Process–Based Constitutional Theory", 89 *Yale L.J.* 1063 (1980); Westen, "The Empty Idea of Equality", 95 *Harv. L.Rev.* 537 (1982). Unlike the majority, I believe we should afford both these fundamental constitutional protections full and equal dignity.

## II.

The majority opinion concludes that under the criteria established by equal protection case law, homosexuals must be treated as a suspect class. Maj. op. at 1345–47. Were it not for *Hardwick* (and other cases discussed *infra* ), I would agree, for in my opinion the group meets all the applicable criteria. *See, e.g.,* Note, "The Constitutional Status of Sexual Orientation: Homosexuality as a Suspect Classification", 98 *Harv.L.Rev.* 1285 (1985). However, after *Hardwick,* we are no longer free to reach that conclusion.[8]

The majority opinion treats as a suspect class a group of persons whose defining characteristic is their desire, predisposition, or propensity to engage in conduct that the Supreme Court has held to be constitutionally unprotected, an act that the states can—and approximately half the states have[9]—criminalized.[10] Homosexuals are different from groups previously afforded

---

**6.** *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

**7.** That Dean John Hart Ely has "severely criticized" *Roe v. Wade,* maj. op. at 1341 n. 21, makes the majority's position no more persuasive and *Roe v. Wade* no less binding or important a constitutional decision.

**8.** *See Constitutional Law, supra,* § 16–33, at 1616 n. 47:
> The fact that the Court in *Bowers v. Hardwick,* 106 S.Ct. 2841 (1986), went out of its way to create a line between heterosexuals and homosexuals, where there was none in the challenged sodomy statute, merely to preserve prosecution of homosexuals under the law from constitutional infirmity, indicates

how unlikely it is that homosexuality will be deemed quasi-suspect in the near future. *But compare Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), *with Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).

I note that Professor Tribe's pessimistic forecast relates to intermediate scrutiny and not the even stricter standard that the majority today holds applicable.

**9.** *See Hardwick,* 106 S.Ct. at 2845.

**10.** *Cf. Plyler v. Doe,* 457 U.S. 202, 219 n. 19, 102 S.Ct. 2382, 2396 n. 19, 72 L.Ed.2d 786 (1982) (rejecting the claim that illegal aliens are a suspect class, in part because the defining element of the class is a criminal act).

protection under the equal protection clause in that homosexuals are defined by their conduct—or, at the least, by their desire to engage in certain conduct. With other groups, such as blacks or women, there is no connection between particular conduct and the definition of the group. When conduct that plays a central role in defining a group may be prohibited by the state, it cannot be asserted with any legitimacy that the group is specially protected by the Constitution.[11]

Sodomy is an act basic to homosexuality. In the relevant state statutes, sodomy is usually defined broadly to include "any sexual act involving the sex organs of one person and the mouth or anus of another." *See, e.g., Hardwick,* 106 S.Ct. at 2842 n. 1. The practices covered by this definition are, not surprisingly, the most common sexual practices of homosexuals. Specifically, oral sex is the primary form of homosexual activity. *See* A. Bell & M. Weinberg, *Homosexualities* 106–11, 327–30 (1978). When the Supreme Court declares that an act that is done by a vast majority of a group's members and is fundamental to their very nature can be criminalized and further states that the basis for such criminalization is "the presumed belief of a majority of the electorate ... that [the practice] is immoral and unacceptable"[12], I do not think that we are free, whatever our personal views, to describe discriminatory treatment of the group as based on "unreasoning prejudice". *See* maj. op. at 1345–46. Rather we are obligated to accept the Supreme Court's conclusion that what the majority of this panel calls "unreasoning prejudice" is instead a permissible societal moral judgment.

I have already explained the principal reasons why the majority's interpretation of *Hardwick* as covering heterosexual sodomy is not only incorrect but also damaging to constitutional principles. I must now add that the majority errs for another important reason. The majority states that the equal protection clause requires the government (if it wishes to criminalize homosexual sodomy) to prohibit all persons from engaging in "the proscribed sexual acts". Maj. op. at 1340. This analysis affords equal treatment only in the most superficial meaning of the term. Government actions, neutral on their face, can sometimes have distinctly unequal effects, and carry implicit statements of inequality. *See* L. Tribe, *Constitutional Choices* 238–45 (1985). Laws against sodomy do not affect homosexuals and heterosexuals equally. Homosexuals are more heavily burdened by such legislation, even if we ignore the governmental tendency to prosecute general sodomy statutes selectively against them. *See Hardwick,* 106 S.Ct. 2850 n. 2 (Blackmun, J., dissenting). Oral sex, a form of sodomy, is the primary form of sexual activity among homosexuals; however, sexual intercourse is the primary form of sexual activity among heterosexuals.[13] If homosexuals were in fact a suspect class, a statute criminalizing both heterosexual sodomy and homosexual sodomy would still not survive equal protection analysis. For the prohibition to be equal, the government would have to prohibit sexual intercourse—conduct as basic to heterosexuals as sodomy is to homosexuals.[14]

---

**11.** Thus, it is not even necessary to decide whether the majority's view of *Hardwick*—that it is based on a condemnation of sodomy rather than of homosexuality—is correct. Whatever the explanation for the Court's willingness to allow sodomy to be criminalized—whether its decision is based on its views as to the morality of homosexuality or on its disapproval of sodomy, including the heterosexual variety—that willingness is inconsistent with affording special constitutional protection to homosexuals—a group whose primary form of sexual activity, the Court tells us, may be declared criminal.

**12.** *Hardwick,* 106 S.Ct. at 2846.

**13.** Oral sex, though practiced by a substantial majority of heterosexuals, is not the primary sexual activity for that group. *See* W. Masters, V. Johnson & R. Kolodny, *Human Sexuality* 388–92, 418–22 (2nd ed. 1985).

**14.** Statutes which are neutral on their face survive equal protection scrutiny unless they are the product of discriminatory intent. However, as the Supreme Court has noted, "when a neutral law has a disparate impact upon a group that has historically been the victim of discrimination, an unconstitutional purpose may still be at work. ... Certainly, when the adverse consequences of a law upon an identifiable group are ... inevitable ... a strong inference that the

This, obviously, the government would not and could not do. Therefore, if equal protection rules apply (i.e. if homosexuals are a suspect class), a ban on homosexual sodomy could not stand no matter how the statute was drawn. *Hardwick* makes it plain that the contrary is true.

Finally, the "protection" of homosexual rights provided by the majority opinion is hollow indeed. The majority unwittingly denigrates the equal protection clause as well as the right to privacy. Until now, a "suspect class" has been a group whose members were afforded special solicitude. That is patently not the case with respect to homosexuals. Many states deny that group the right to engage in their most fundamental form of sexual activity. A "life without any physical intimacy", *Hardwick*, 106 S.Ct. at 2850 n. 2 (Blackmun, J., dissenting), is hardly the life contemplated for our citizens by the Declaration of Independence ("the pursuit of happiness") or, one would have thought, by the Constitution. While *Hardwick* may not wholly preclude the possibility of lawful physical intimacy for homosexuals, it drastically limits that right. To proclaim that under these circumstances homosexuals are afforded special protection by the Constitution would be hypocritical at best.

Before concluding my discussion of *Hardwick*, I wish to record my own view of the opinion. I have delayed doing so until I have applied the case as I believe we have a duty to apply it. Now, I must add that as I understand our Constitution, a state simply has no business treating any group of persons as the State of Georgia and other states with sodomy statutes treat homosexuals. In my opinion, invidious discrimination against a group of persons with immutable characteristics can never be justified on the grounds of society's moral disapproval. No lesson regarding the meaning of our Constitution could be more important for us as a nation to learn. I believe that the Supreme Court egregiously misinterpreted the Constitution in *Hardwick*. In my view, *Hardwick* improperly

condones official bias and prejudice against homosexuals, and authorizes the criminalization of conduct that is an essential part of the intimate sexual life of our many homosexual citizens, a group that has historically been the victim of unfair and irrational treatment. I believe that history will view *Hardwick* much as it views *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). And I am confident that, in the long run, *Hardwick*, like *Plessy*, will be overruled by a wiser and more enlightened Court. *See Hardwick*, 106 S.Ct. at 2856 (Blackmun, J., dissenting).

The decision in *Hardwick* has not affected my firm belief that the Constitution, properly interpreted, does afford homosexuals the same protections it affords other groups that are historic victims of invidious discrimination. Nevertheless, for the reasons I have already stated, it is my obligation to follow *Hardwick* as long as it has precedential force—and for now it does.

### III.

Even if the majority's analysis could survive *Hardwick*, we would be precluded by our own circuit precedent from concluding that homosexuals are a suspect class. In *Hatheway v. Secretary of Army*, 641 F.2d 1376 (9th Cir.1981), we considered a challenge brought by an army officer convicted of sodomy by a general court-martial. We rejected Lieutenant Hatheway's claim that the practice of prosecuting homosexuals but not heterosexuals under a general sodomy statute was unconstitutional. We stated: "We understand Hatheway's claim (that the commission of a homosexual act is an impermissible basis for prosecution) to be an equal protection argument." *Id.* at 1382. We then applied intermediate level scrutiny and concluded that the government could single out those who engage in "homosexual acts". *Id.* Our determination that strict scrutiny did not apply to Lt. Hatheway's claim, *id.*, must necessarily be

---

adverse effects were desired can reasonably be drawn." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 273, 279 n. 25, 99

S.Ct. 2282, 2293, 2296 n. 25, 60 L.Ed.2d 870 (1979).

interpreted as meaning that we concluded that homosexuals are not a suspect class.

The majority argues that because our analysis in *Hatheway* was apparently based on the "fundamental rights branch" of equal protection analysis rather than on the "suspect class branch", *Hatheway* does not preclude the holding that homosexuals are a suspect class. Maj. op. at 1342–43. I disagree. The majority's position is based on too narrow a view of how courts decide constitutional questions and too narrow a view of the extent to which we are bound by constitutional holdings. Had we thought in *Hatheway* that strict scrutiny was required by a "different branch" of the equal protection clause, it would have been our obligation to apply the higher test. The equal protection issue was squarely presented by Lt. Hatheway. We could not have ruled against him, as we did, and failed to apply a standard under which he might have prevailed unless we believed the higher standard was inapplicable. Nowhere does the opinion state that Lt. Hatheway relied on one particular branch of the doctrine to the exclusion of the other, and we may not fairly make that assumption. Nor are we free to refuse to apply our own precedent simply because the reasoning may be unpersuasive or the explanation less than complete. The holding in *Hatheway* is clear: intermediate level scrutiny, rather than strict scrutiny, applies to an equal protection claim based on discrimination against homosexuals. Because in *Hatheway* we recognized the equal protection claim, acknowledged the "three-tier approach", applied the intermediate level of scrutiny, and ruled against the plaintiff, I do not believe we can blithely ignore its holding.[15]

## IV.

Because we are not free to hold that homosexuals are a suspect class, we can not apply strict scrutiny to the Army's regulations. At the most the regulations must pass intermediate scrutiny—and in *Hatheway* we decided that the military's singling out of homosexual conduct for special adverse treatment survives that level of review: applying intermediate level scrutiny we concluded that prosecutions by the military on the basis of sexual preference bear "a substantial relationship to an important government interest." *Id.* at 1382. We then upheld the Army's discriminatory treatment of Hatheway. We are bound by *Hatheway* to conclude that military "[c]lassifications which are based solely on sexual preference" survive an intermediate level of review.[16] *Id.*

Courts must give special deference when adjudicating matters involving the military. *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986); *Rostker v. Goldberg*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). In the context of a first amendment challenge, the Supreme Court has recently stated: "Our review of military regulations ... is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman v. Weinberger*, 106 S.Ct. at 1313. In *Beller v. Middendorf*, Judge, now Justice, Kennedy writing for our court said: "constitutional rights must be viewed in light of the special circumstances of the armed forces". 632 F.2d at 810–11.

In rejecting the Army's justifications for the regulation, the majority fails to give

---

**15.** Moreover, the majority's assumption that *Hatheway* relied solely on the "fundamental rights branch" may be based on an overly-simplified view of equal protection doctrine. While many equal protection cases clearly fall exclusively within one branch or the other, some, like *Hatheway*, do not. The facts in *Hatheway* involved both an activity to which special protection may be applicable—private sexual activity—and a group for which special protection may be required—homosexuals. In addition, the group is defined by its connection to the activity. Thus, *Hatheway* presents the paradigmatic

circumstances that call for a mixture or merger of the two branches. It appears that we may, intentionally or inadvertently, have used that approach in that case. *See Hatheway*, 641 F.2d at 1382.

**16.** The only real question regarding *Hatheway* is whether our holding that mid-level scrutiny is applicable survives *Hardwick*. *Hatheway* established a ceiling for the appropriate level of scrutiny; *Hardwick* makes it clear, at a minimum, that the ceiling can be no higher.

proper deference to the Army's determinations. Its failure to do so may result in part from its unwillingness to recognize the moral judgments regarding homosexuality approved in Hardwick, 106 S.Ct. at 2846, and deemed permissible, at least for the purpose of military regulations, by Judge Kennedy in Beller, 632 F.2d at 811–12. Although I see no merit in the Army's ideas about homosexuals, its beliefs about the consequences of allowing homosexuals to serve in the Army, and its pandering to negative stereotypes of homosexuals, see maj. op. at 1349–51, we are not permitted to substitute our views for the Army's "considered professional judgment" as to what kind of persons should be barred from enlisting in order to ensure a disciplined fighting force.[17] Goldman v. Weinberger, 106 S.Ct. at 1313.

After analyzing the various explanations offered by the Army, the majority dismisses the purposes of the regulations as illegitimate or irrational. Maj. op. at 1349–52. Again, the majority takes a position that is not open to us. For not only have our cases told us we must defer to the military judgment in matters of this kind, they have upheld the very reasoning the majority now rejects. The justifications advanced by the Army involving negative views about homosexuals and homosexuality have been accepted by earlier decisions of this court as both legitimate and important. Beller, 632 F.2d at 811–12; see Hatheway, 641 F.2d at 1381–82. We are not free to reconsider those prior conclusions unless or until our court as a whole agrees to do so en banc.

It is true that, as the majority says on several occasions, maj. op. at 1340, 1350–51, the Army could not treat blacks as it treats homosexuals and could not base its regulations on negative judgments regarding blacks. No matter how appealing the analogy may be, we are not free to draw it here. Beller and Hatheway both approve discriminatory treatment against homosexuals, by the military, based on moral judgments regarding homosexuality. See Beller, 632 F.2d at 811–12; Hatheway, 641 F.2d at 1381–82; see also Hardwick, 106 S.Ct. at 2846. As the majority points out, similar biases against blacks could not form the basis for state action against that group. Palmore v. Sidoti, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). Thus, cases regarding blacks are simply irrelevant.[18]

## V.

The majority attempts to overcome the problems posed by Hardwick (and, to some extent, by Hatheway) by distinguishing between the class of persons who engage in homosexual acts and the slightly broader class of persons who have a homosexual orientation. Relying on this distinction, the majority also argues that the Army regulation is about status, not conduct. It is unclear whether the majority is arguing that homosexuals are a suspect class simply because they are a class defined by status rather than conduct, or whether it is arguing that the equal protection question is unaffected by Hardwick because that case involves conduct rather than orientation. In either event, I do not believe we can escape the conclusion that "homosexuals", however defined, cannot qualify as a suspect class.

Even if we define the class as those who have a "homosexual orientation", its mem-

---

17. To the claim in Goldman v. Weinberger that the military's regulation as applied was irrational and without empirical support, the Court stated:

But whether or not expert witnesses may feel that religious exceptions to AFR 35–10 are desirable is quite beside the point. The desirability of dress regulations in the military is decided by the appropriate military officers, and they are under no constitutional mandate to abandon their considered professional judgment.

106 S.Ct. at 1314.

18. I am not suggesting, by any means, that all discriminatory statutes affecting homosexuals are valid. We are here dealing only with military regulations. Other governmental action, including state statutes, would still be subject to examination under a number of constitutional principles, including the equal protection clause. As far as that clause is concerned, for purposes of this case it is necessary for me to conclude only that strict scrutiny is not the proper standard. See note 16, supra.

bers will consist principally of active, practicing homosexuals.[19] That the class may also include a small number of persons who are or wish to be celibate is irrelevant for purposes of determining whether the group as a whole constitutes a suspect class. I simply see no way to say that homosexuals defined broadly (by status) are a suspect class, but that the same group, if more narrowly defined (by conduct) is not. Whether the group is defined by status or by conduct, its composition is essentially the same. In short, "homosexuals" are either a suspect class or they aren't. The answer cannot depend on the niceties of the class definition.[20]

What the majority may be arguing is that a regulation targeted at "orientation" is too broad to survive rationality review. However, if the majority is making this argument, there are a number of difficult questions it must answer first. For example, under the majority's status/conduct distinction, Watkins could be excluded from the Army based on regulations slightly more narrowly drawn so as to target only the class of persons who have engaged in homosexual conduct. If Watkins' actions fall within that narrower category (and they do), and Watkins is therefore a member of a class of persons that is not constitutionally protected, does he have standing to challenge the constitutionality of these regulations?[21] If he does, would the cor-

rect remedy be simply to strike the few words that make the regulations too broad, rather than invalidating all of the regulations?[22] *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). The majority simply does not discuss these and other similarly troublesome questions.

Moreover, I disagree with the majority's status/conduct distinction, as applied to this case, for another reason. I view the case before us as a conduct case. In my opinion, the facts regarding Watkins clearly demonstrate disqualifying acts and the regulations before us may properly be viewed as conduct regulations. First, Watkins has admitted to engaging in homosexual conduct with other servicemen while in the Army. Those admissions form an integral part of the reasons for the Army's refusal to permit him to reenlist. Second, the regulations must be construed in light of the Army's stated policy regarding homosexuality:

> Homosexuality is incompatible with military service. The presence in the military environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission.

Army Regulation 635–200 ¶ 15–2.[23] Read in this light, the regulations constitute an

19. The majority appears to be unwilling to acknowledge this point. See maj. op. at 1339 n. 14. However, the fact that homosexuals (or persons of "homosexual orientation") engage in or seek to engage in homosexual conduct is as unremarkable as the fact that "heterosexuals" (or persons of "heterosexual orientation") engage in or seek to engage in heterosexual conduct. To pretend that homosexuality or heterosexuality is unrelated to sexual conduct borders on the absurd. What distinguishes the class of homosexuals from the class of heterosexuals is not some vague "range of emotions", but the nature of the member's sexual proclivities or interests.

20. Nowhere in equal protection jurisprudence can there be found a protected class that is merely a slightly broader form of an unprotected class. In the end, the majority's distinction between status and conduct comes to nought. For if homosexuals were truly a suspect class, an Army regulation based on conduct would be

as unconstitutional as one based on status. *See* maj. op. at 1340 ("We cannot read *Hardwick* as standing for the proposition that government may outlaw sodomy only when committed by a disfavored class of persons.").

21. *See, e.g., Hatheway,* 641 F.2d at 1382–83 (person accused of homosexual sodomy lacks standing to challenge the constitutionality of applying a sodomy law to heterosexuals).

22. For example, the underlined words could be removed from the regulation's definition of "homosexual": "Homosexual means a person, regardless of sex, who engages in, *desires to engage in,* or intends to engage in homosexual acts." Army Regulation 635–200 ¶ 15–2(a) (emphasis added).

23. The statement of policy is from the section "Separation for Homosexuality". However, there is no reason to believe that it would not be equally applicable to the section which states

attempt to exclude those who engage in or will engage in homosexual acts. The majority makes much of the fact that the regulation allows a soldier an opportunity to prove that a homosexual act he has engaged in was aberrational. Maj. op. at 1338. Contrary to the majority, I do not think that this proves that the regulation is about orientation rather than conduct. The regulation's exception relates to conduct: it allows the Army to distinguish between soldiers who are likely to engage in homosexual conduct in the future (practicing homosexuals) and those who are not likely to do so (heterosexuals who engage in an isolated homosexual act due to intoxication or some similar reason). I consider the inclusion of this exception in the regulation to constitute a rational exercise of discretion—a legitimate attempt to predict future conduct on the basis of past conduct. However, I see little purpose in analyzing the Army's regulations in detail here. Suffice it to say that I disagree with the majority's characterization of them. In my opinion, the regulations are targeted at conduct —past, present, and future, but conduct nonetheless.

In the end the majority's status/conduct distinction does not advance its cause.[24] With or without that part of its analysis, the majority's effort ultimately comes a cropper on *Hardwick, Hatheway, Beller, Goldman* and *Rostker.*[25]

## CONCLUSION

As the majority points out, Sgt. Watkins has every reason to feel aggrieved. His homosexuality has been well known for many years. During that entire period, his army service has been exemplary. Those who have worked with him, including his supervisors, are anxious to see him continue with his military career. Yet, under the Supreme Court's (and our own circuit's)

interpretation of the Constitution, the Army is free to terminate that career solely because he is a homosexual. There are only three entities which have the authority to afford Sgt. Watkins the relief which I, like the majority, believe a proper interpretation of the Constitution would require. First, the Supreme Court could undo the damage to the Constitution wrought by *Hardwick;* it could overrule that precedent directly or implicitly. Second, the Army could voluntarily abandon its unfair and discriminatory regulation (or, I would assume, the Department of Defense could direct it to do so). Third, the Congress could enact appropriate legislation prohibiting the armed services from excluding homosexuals. I recognize that from a practical standpoint the existence of these forums may offer Sgt. Watkins little solace. Nevertheless, I do not believe that a panel of the Ninth Circuit may, consistent with its duty to apply precedent properly, afford him the relief he seeks.

For the above reasons, I must reluctantly dissent.

---

that homosexuality is a nonwaivable disqualification for reenlistment. Both sections use the same definition of "homosexual".

**24.** I do not reach the question whether that distinction is relevant for purposes other than criminal law. *Cf. Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (criminal penalties must be based on some act;

they may not be inflicted merely on the basis of a person's condition).

**25.** As the majority acknowledges, its conclusions are also contrary to those of several other circuits. In particular, *see Padula v. Webster,* 822 F.2d 97 (D.C.Cir.1987), and maj. op. at 1344 & n. 25.